(January 13, 1904.)

## STEIN v. MORRISON, GOVERNOR.

### [75 Pac. 246.]

CURRENT EXPENSE OF STATE—LEGISLATIVE APPROPRIATIONS—TAX LEVY —MEANS OF. RAISING REVENUE—DEBT LIMITATION—CONSTITUTIONAL PROVISIONS—WRIT OF PROHIBITION—WHEN WILL ISSUE— EXECUTIVE ACTS—MINISTERIAL ACTS—TECHNICAL QUESTIONS— INTERPRETATION OF CONSTITUTIONAL AND STATUTORY PROVISIONS— JURISDICTION—JUDICIAL AND QUASI JUDICIAL ACTS.

1. Section 2 of article 7 of the constitution recognizes other methods of raising revenue than that by a tax levy on real and personal property.

2. It must be assumed by the courts, until the contrary appears, that the legislature in making their biennial appropriations and tax levy to meet the same estimated the amount of revenue the state would derive from all other sources than that of a tax levy, and that sufficient levy was made to cover the difference between the total appropriation and the amount to be received from other sources than that of a tax levy.

3. The court must take judicial notice of the constitutional and statutory methods provided for raising revenues and augmenting the public funds, but cannot take notice of the amount so raised and received, and until it is shown that the total income for the two years for which legislative appropriations are made is not sufficient to meet such appropriations, the courts will assume that the legislature has kept within the constitutional limitations.

4. Article 7 of the constitution contemplates a complete scheme for the collection of taxes and revenue and the payment of the current expenses of the state, looking to the general purpose of ending the two years for which appropriations are made with the

expenses of maintaining the state government for that period fully paid.

5. The public revenues may be appropriated by the legislature in anticipation of their receipt as was done by the general appropriation act of March 11, 1903 (Sess. Laws 1903, 308), and it is not necessary to the validity of such an appropriation that funds should be in the treasury at the time to meet the same.

6. Such appropriations do not constitute a debt or liability against the state within the provisions of section 1, article 8, of the constitution, but rather operate upon the incoming revenues for the same period of time in the nature of a cash transaction as contemplated by article 7.

7. So long as the financial system is carried out in accordance with the requirements of article 7, the current expenses of the state government cannot accumulate or ripen into a debt.

8. Petition examined and held that it does not state facts sufficient to entitle plaintiff to the relief demanded.

9. The courts cannot disregard the provisions of the constitution and laws, notwithstanding the fact that defenses interposed thereunder may be designated *technical*.

10. Under our constitution and form of government which recognizes the independence of the "three distinct departments of government," the judicial department cannot prohibit the executive department from acting within the recognized scope of that branch of the government.

11. The writ of prohibition as authorized by section 9 of article 5 of the constitution is the writ of prohibition as known and recognized at common law.

12. Such writ does not lie to prohibit or restrain purely ministerial acts, but runs to restrain encroachment of jurisdiction assumed to be exercised of a judicial or *quasi* judicial function.

13. *Williams v. Lewis*, 6 Idaho, 184, 54 Pac. 619, distinguished; and expressly overruled in so far as it holds that the writ of prohibition will lie to restrain a purely ministerial act.

14. The word *"jurisdiction,"* as used in section 4994, Revised Statutes, means the right to hear and determine a matter, and carries with it the idea of exercising judicial or *quasi* judicial functions.

15. When a statutory or constitutional provision is adopted from another state, where the courts of that state have placed a construction upon the language of such statute or constitution, it is to be presumed that it was taken in view of such judicial interpretation, and with the purpose of adopting the language as the same had been interpreted and construed by the courts of the state from which it was taken.

(Syllabus by the court.)

ORIGINAL application for writ of prohibition.

Ralph P. Quarles, for Plaintiff.

The act of March 16, 1903, the funding bond act, contravenes the constitution in three respects: It exceeds when added to the other expenditures authorized, the tax levies provided for the years of 1903 and 1904; it increases the debts and liabilities of the state beyond the limit fixed by section 1, article 8 of the constitution; it provides money for building a bridge and a wagon road authorized by local and special laws, contrary to the provisions of section 19, article 3 of the constitution; and it provides for raising money which must be repaid by taxation for a purely private purpose, and gives or lends the faith and credit of the state to a private corporation for private purposes contrary to the provisions of section 2, article 8 of the constitution. The issuance of the bonds provided for in this act amounts to an appropriation to the extent of the sale of the bonds, for purposes prohibited by the constitution, and the sale of them to the school fund, or exchanging them for money in the school funds, as defendants are doing, is unconstitutional, and unauthorized. (Idaho Const., art. 3, sec. 19, art. 7, secs. 11, 14, art. 8, secs. 1, 2, art. 9, sec. 3.) The power to create debts or liabilities and to levy taxes cannot exceed the limits fixed by the constitution. (Cooley on Taxation, 3d ed., 172, 173, and authorities cited; Cooley's Constitutional Limitations, 6th ed., 636.) The legislature cannot levy taxes for private purposes unless authorized by constitutional provisions to do so. Bounties to the producers of sugar, manufacturers of bridges, the grower of trees, private educational institutions, etc., are contrary to the genius of free institutions, amount to the confiscation of property for private uses, and such acts are universally held to be void. (Cooley on Taxation, 3d ed., 84; Cooley's Constitutional Limitations, 6th ed., 207, 587, 598, 599, 636; *Loan Assn. v. Topeka,* 20 Wall. 655, 22 L. ed. 455; *Cole v. La Grange,* 113 U. S. 1, 28 L. ed. 896, 5 Sup. Ct. Rep. 416; *City of Parkersburg v. Brown,* 106 U. S. 487, 27 L. ed. 238, 1 Sup. Ct. Rep. 442; *Michigan Sugar Co. v. Dix,* 124 Mich.

674, 83 Am. St. Rep. 354, 83 N. W. 625; *Sutherland-Innes Co. v. Village of Evart,* 86 Fed. 597; *Dodge v. Township of Mission,* 107 Fed. 827, 46 C. C. A. 661, 54 L. R. A. 242; *Bush v. Board of Supervisors,* 159 N. Y. 212, 70 Am. St. Rep. 538, 53 N. E. 1121, 45 L. R. A. 556; *Luques v. Dresden,* 77 Me. 186; *Allen v. Jay,* 60 Me. 124, 11 Am. Rep. 185; *Weismer v. Douglass,* 64 N. Y. 91, 21 Am. Rep. 586; *Opinion of the Judges,* 58 Me. 590; *Mather v. Ottawa,* 114 Ill. 659, 3 N. E. 216; *Ottawa v. Carey,* 108 U. S. 110, 27 L. ed. 669, 2 Sup. Ct. Rep. 361; *Coates v. Campbell,* 37 Minn. 498, 35 N. W. 366; *Attorney General v. Eau Claire,* 37 Wis. 400; *Osborne v. Adams,* 106 U. S. 181, 27 L. ed. 129, 1 Sup. Ct. Rep. 41; *State v. Adams,* 15 Neb. 569, 20 N. W. 96; *Sharpless v. Mayor,* 21 Pa. St. 168, 59 Am. Dec. 759; *Curtis v. Whipple's Admr.,* 24 Wis. 350, 1 Am. Rep. 187; *Deal v. Mississippi County,* 107 Mo. 464, 18 S. W. 24, 14 L. R. A. 622; *People v. Salem,* 20 Mich. 452, 4 Am. Rep. 400; *Chapman v. City of New York,* 168 N. Y. 80, 85 Am. St. Rep. 661, 61 N. E. 108, 56 L. R. A. 846; *Lowell v. City of Boston,* 111 Mass. 454, 15 Am. Rep. 39; *Feldam v. City of Charleston,* 23 S. C. 57, 55 Am. Rep. 6; *State v. Osawkee Township,* 14 Kan. 418, 19 Am. Rep. 99; *Whiting v. Sheboygan etc. Ry. Co.,* 25 Wis. 167, 3 Am. Rep. 30.) These authorities establish beyond dispute that the legislature cannot raise money by taxation nor authorize issuance of the bonds of the state for the purpose of paying sugar bounties. The act creating or authorizing the construction of the Weiser bridge, and the Long Valley road, are each local and special, and contrary to the provisions of section 19, article 3 of the constitution. A law which applies or operates upon one portion of the state only, in terms and in effect, is local, while a law which operates upon or applies to one person or thing, or less than all of the persons and things in a given class, is special. This rule of statutory construction is too well recognized to require citation of authority.

John A. Bagley, Attorney General, for Defendants.

The plaintiff has an adequate remedy at law. If the laws complained of are void, or authorize an illegal bond issue, the

plaintiff cannot be compelled to pay taxes on his property in payment of the same. No provision has yet been made for the payment of any of these bonds by a tax levy. The writ of prohibition will not issue to prohibit or restrain the acts of executive or ministerial officers. Excess of jurisdiction: The petition should show that the plaintiff called the defendants' attention to the excess of their jurisdiction. This is not done. (16 Ency. Pleading & Practice, 1128, note 5; 59 Cal. 471; 72 Cal. 572; 26 Ark. 52; 42 Mich. 239, 3 N. W. 913; 137 Mo. 681, 39 S. W. 276; 21 Nev. 47, 37 Am. St. Rep. 478, 24 Pac. 367; 4 Utah, 382; 5 Utah, 531; 47 La. Ann. 1, 16 South. 586.) The writ of prohibition issues to restrain acts of judicial tribunals boards, etc., only, and not ministerial officers or acts. (53 Cal. 291; 52 Cal. 111; 116 U. S. 574, 21 L. ed. 735, 6 Sup. Ct. Rep. 510, 54 Pac. 619 (should be overruled); 57 Cal. 550; 63 Cal. 245; 62 Cal. 407.) The writ of prohibition will not lie against board of election commissioners. (54 Cal. 404; 20 N. Y. 540; 26 Mo. 253.) Nor against a tax collector. (High on Extraordinary Legal Remedies, 782; 53 Cal. 289.) Is not the remedy for illegal taxation. (46 Cal. 455; 47 Cal. 651; 36 Cal. 67; 48 Cal. 65; 92 U. S. 606, 23 L. ed. 663.) The taxpayer suffers no wrong until he pays the tax, and if it be illegal he can recover back. (97 Mass. 152.) An action for the recovery of taxes paid under protest is the remedy for illegal taxation. (49 Cal. 648; 51 Cal. 369; 52 Cal. 80, 170; 53 Cal. 380.) Writ will not issue to restrain auditor from drawing warrants (57 Cal. 550); or from proceeding against defaulting collector (42 Mo. 133); or governor from issuing commission to an officer on the ground of its irregularity (4 McCord (S. C.), 206, 17 Am. Dec. 731); or mayor from investigating misconduct of chief of police (23 Gratt. 51; 14 Bush, 234); or board of supervisors of a city from passing an ordinance fixing the price of water. (63 Cal. 245.) Nor against legislative or executive officers. (16 Ency. Pleading & Practice, 1108, cases cited. See title "Prohibition," Ency. of Pl. & Pr., 1094; 127 Mass. 50, 34 Am. Rep. 338; 1 Hill, 195; 7 Wend. 486; 104 N. C. 818, 10 S. E. 696, 1023; 116 U. S. 167, 6 Sup. Ct. Rep. 570; 20 N. Y. 531; 68 Conn. 543, 37 Atl. 388;

30 W. Va. 534; 33 Wis. 93, 3 L. R. A. 56; 15 Q. B. 446; Shortt on Mandamus and Prohibitions, 452; 41 Mo. 44; 2 Hill, 367, 38 Am. Dec. 593, 66 Ala. 453; High on Extraordinary Legal Remedies, 782, 783; 6 Colo. 534.) The executive branch of our state is administered by the governor and his official family, and the judiciary has no authority to invade the realm of that department with extraordinary writs' or attempt to control their official acts or discretionary powers. (55 Cal. 483; 17 Colo. 156, 31 Am. St. Rep. 284, 28 Pac. 1125; 127 Ind. 588, 22 Am. St. Rep. 663, 27 N. E. 175, 11 L. R. A. 763; 22 Md. 170, 85 Am. Dec. 643; 78 Md. 152, 27 Atl. 616; High on Extraordinary Legal Remedies, 782, 783.)

Wood & Wilson, for Defendants.

Biennial appropriations and expenditures authorized thereby, the payment of which is provided for by tax levy and other sources of revenue, are not included in the debt limitation prescribed by section 1, article 8 of the constitution. Plaintiff's application must fail, because he has not pointed out and specifically shown the court wherein the liabilities pleaded exceed the constitutional limit of indebtedness. Plaintiff alleges in his petition that the outstanding bond and warrant indebtedness when the legislature convened amounted to $752,619.54. In computing the debt limit, section 1, article 8 of the constitution excluded therefrom the debt of the territory at the date of its admission as a state. It is absolutely impossible, from the petition, to determine what portion of the above indebtedness comes within this particular exception. Section 1, article 8 of the constitution provides that "the legislature shall not in any manner create any debt or debts, liability or liabilities which shall, singly or in the aggregate, exclusive of the debt of the territory at the date of its admission as a state, exceed the sum of one and one-half per centum upon the assessed value of the taxable property in the state," with certain exceptions. This, we insist, is a limitation upon the outstanding bonded indebtedness of the state, or such indebtedness as is not included within the general appropriations authorized, required and limited by section 11, article 7 of the constitution. Our

contention that the debt limitation prescribed by section 1, article 8 of the constitution does not include the biennial appropriation provided for in section 11, article 7 of the constitution is fully sustained by a well-settled line of authorities in California, based upon the constitutional provision from which our section 1 article 8 was copied. (*State v. McCauley,* 15 Cal. 430; *McCauley v. Brooks,* 16 Cal. 24; *Koppikus v. State Capitol Commission,* 16 Cal. 249; *People v. Pacheco,* 27 Cal. 176; *McBean v. City of Fresno,* 112 Cal. 159, 53 Am. St. Rep. 191, 44 Pac. 358, 31 L. R. A. 794; *Water Co. v. City of Salem,* 5 Or. 29; *Law et al. v. People,* 87 Ill. 385; *City. of Springfield v. Edwards,* 84 Ill. 631; *Valparaiso et al. v. Gardner,* 97 Ind. 2, 49 Am. Rep. 416.) The writ of prohibition will not lie where the proceedings which it is sought to prohibit are absolutely void. (*Woodward et al. v. City of San Francisco,* 95 Cal. 272, 30 Pac. 535; *Barnes v. Gottschalk,* 3 Mo. App. 222.) The power to declare a statute unconstitutional is one of the highest intrusted to a judicial tribunal, and is only to be exercised with the greatest care, and only when there is no doubt of the unconstitutionality of the law. If there is any doubt in the mind of the court as to the constitutionality of a law, it must be resolved in favor of its validity. To doubt is to resolve in favor of the constitutionality of the law. (*Citizens' Street Ry. Co. v. Haugh,* 142 Ind. 254, 41 N. E. 533, and cases cited; *State v. Roby,* 142 Ind. 168, 51 Am. St. Rep. 174, 41 N. E. 145, 33 L. R. A. 213; *People v. Draper,* 15 N. Y. 545; *Carpenter v. People,* 8 Colo. 116, 5 Pac. 825; *Darrow v. People,* 8 Colo. 426, 8 Pac. 924; *People v. McFadden,* 81 Cal. 489, 15 Am. St. Rep. 66, 22 Pac. 851; *Wichita v. Burleigh,* 36 Kan. 34, 12 Pac. 332; *Ex parte Williams,* 87 Cal. 78, 25 Pac. 248; *McDonald v. Conniff,* 99 Cal. 386, 34 Pac. 71; *Smith v. McDermott,* 93 Cal. 421, 29 Pac. 34; *Sabin v. Curtis,* 3 Idaho, 662, 32 Pac. 1130; *City of Guthrie v. Territory,* 1 Okla. 180, 31 Pac. 190; *People v. Mullender,* 132 Cal. 217, 64 Pac. 299.)

## STATEMENT OF FACTS.

The plaintiff filed his petition herein for a writ of prohibition against the governor, Secretary of State, attorney general,

state treasurer and state auditor, praying the issuance of a writ from this court prohibiting the defendants issuing and selling the bonds of the state as authorized by certain acts of the seventh legislative session of the state legislature. The first cause of action is set out in the petition as follows:

"The petitioner and affiant, Edward Stein, being first duly sworn, on his oath deposes and says: That he is a citizen of the United States, and of the state of Idaho, and that he is a taxpayer and resident of and in the state of Idaho, and beneficially interested in the above-entitled action, in the subject matter thereof, and in the result of the same. That the defendant, John T. Morrison, is the duly elected, qualified and acting governor of the state of Idaho. That the defendant, H. N. Coffin, is the duly elected, qualified and acting state treasurer of the state of Idaho. That defendant, Will H. Gibson, is the duly elected, qualified and acting Secretary of State of the state of Idaho. That the said defendants, respectively, acting in their respective official capacities, have, wrongfully, unlawfully, and without authority of law, as affiant is informed, advised and verily believes, issued the bonds of this state, registered and caused the same to be registered in the state auditor's office, and sold and invested the same in the public school funds held in trust by the state for school purposes, under that certain act passed or attempted to be passed by the seventh session of the Idaho legislature, entitled 'An act providing money to pay certain appropriations made by the legislature, and to pay certain deficiency claims against the state of Idaho by providing for the issuance of bonds and making provision for the payment of interest thereon and creating a sinking fund,' approved March 16, 1903, to the extent of $93,000. That the said defendants, acting in their respective official capacities, will, as this affiant is informed and verily believes, wrongfully, unlawfully and without authority of law, and contrary to the constitution of Idaho, issue, register and cause to be registered in the state auditor's office of Idaho, and sell and invest in the public school funds now held in trust for school purposes by the state, the further bonds of the state, under the provisions

of said entitled act, unless prohibited and restrained from so doing by the orders and process of this honorable court.

"The affiant is advised, informed and verily believes that the said act of the legislature approved March 16, 1903, known as the deficiency bond act, and entitled as above set forth, does not vest authority in the said defendants, in their said respective official capacities or otherwise, to issue or cause to be issued, or registered in the said state auditor's office, or to sell or invest in the public school fund held in trust by the state, the bonds of the state to any amount or sum whatever, and that the said act is void and contravenes the provisions of the constitution of Idaho in the following particulars, to wit:

"1. Said act attempts to increase the expenditures and appropriations which said session of the legislature authorized, for the years of 1903 and 1904, and each of said years, in and to sums exceeding the tax levy provided for the said years and each of them, contrary to the provisions of section 11, article 7 of the said constitution.

"2. Said act attempts to authorize expenditures and to create debts and liabilities of the state, which, added to the prior and then existing liabilities and debts of the state, exceed one and one-half per cent of the assessed valuation of property in the state, contrary to the provisions of section 1, article 8 of said constitution.

"3. It provides, or attempts to provide, by taxation money for private purposes; money to be paid out of the state treasury in bounties to the producers of sugar in Idaho from beets grown in Idaho, to subsidize and assist the private enterprise of manufacturing sugar in the state of Idaho, contrary to the express provisions of section 2, article 8 of the said constitution.

"4. It provides, or attempts to provide, money raised by general taxation for the construction of a local bridge and local road, both of which were attempted to be authorized by those certain special and local acts passed by the seventh session, to wit, that certain act entitled 'An act to appropriate fifteen thousand dollars as a portion of the expense of erecting a steel bridge across Snake river at a point near Weiser in the county

of Washington,' approved February 27, 1903; and that certain other act entitled 'An act to provide for the construction of a wagon road in the counties of Boise and Idaho and creating a fund for the completion of the same, and providing therefor the sum of twenty thousand dollars, and requiring a donation from citizens in order to insure the completion of the construction of said road,' approved March 11, 1903, contrary to the provisions of section 19, article 3 of said constitution.

"Affiant, the plaintiff and petitioner, says that he is informed from the records in the said state auditor's office, and verily believes, and therefore states the fact to be, that the total assessed valuation of property in the state of Idaho, after the same had been equalized by the state board of equalization, was, at the time of the passage and approval of said acts, and each of them, the sum of $61,290,875.36 and no greater sum or valuation. That the subsequent assessment made for the year of 1903, after the same had been equalized by the state board of equalization, amounts to the sum of $65,961,583.09 and no greater sum or valuation. That the indebtedness of the state, including outstanding warrants and bonds purchased and held with the public school and other special funds held in trust for different purposes by the state, amounted at the time of the convening of the said seventh session of the legislature to the sum of $752,619.54. That the following specific appropriations and expenditures were authorized, or attempted to be authorized by the said session of the legislature, to wit: For legislative expenses (Acts 1803, page 3), $50,000; for Academy of Idaho, deficiency (Id., page 8, $6,554.56; for bridge at American Falls (Id., page 55), $10,000; for pure food commission (Id., page 98), $4,900; for Salmon river bridge (Id., page 146), $3,000; for game and fish warden (Id., page 20), $2,000; general appropriation bill (Id., pages 304 to 308), $598,375; making the total specific appropriations in the sum of $674,375.56, for which no bond issues were authorized, but to meet which a tax levy of $275,000 for each of the years of 1903 and 1904, or $550,000 for the two years, was provided.

"That in addition to said specific appropriations for amounts certain, the said seventh session of the legislature assumed the

authority, but without right so to do, as plaintiff is advised, informed and verily believes, to pledge the faith and credit of the state for the payment of bounties upon sugar produced within the state during the years of 1903 and 1904 from beets grown in the state in some uncertain and unascertained amount by attempting to authorize the payment of bounty upon sugar produced as aforesaid, out of the public treasury, moneys raised and to be raised by taxation of the property of the citizens of the state, by passing that certain act entitled 'An act to provide for the encouragement of beet sugar within the state of Idaho, and to provide a bounty for the manufacture of the same, and prescribing the manner of the payment of said bounty, and providing appropriation to carry out the provisions of this act,' approved March 11, 1903. Affiant says that he is informed and verily believes that the bounty on sugar that has already been produced in the state of Idaho, and which will be produced during the years of 1903 and 1904, from beets grown within the state of Idaho, will amount to a sum of not less than $100,000, and will probably reach the sum of $200,000. That the Idaho Sugar Company, a corporation organized under the laws of Utah, but doing business in Idaho, has created a large sugar manufactory near Idaho Falls, in the state of Idaho, and is now manufacturing sugar at the rate of more than one hundred thousand pounds daily, and has on hand large quantities of beets grown in Idaho, and has prepared to raise large quantities of beets in Idaho during the year of 1904, and has contracted with divers persons to raise other large quantities of beets in Idaho during the year of 1904. That another large sugar factory is now in process of construction in Fremont county, in this state, and others are projected, one of them to be erected at or near the town of Caldwell in this state, by a corporation already organized, of which Frank Stunenberg is president, and that the general appropriation of one cent per pound for bounty on sugar produced in the state during the year of 1903 and one-half of one cent per pound on sugar produced in the state during the year of 1904, as promised by said act of March 11, 1903, will, if said act be held valid, result in raids upon the

treasury of the state of Idaho, as affiant is informed and verily believes, in sums exceeding $200,000. That the appropriations and expenditures made and authorized, or attempted to be made and authorized, by said seventh session of the legislature for the years of 1903 and 1904, will, exclusive of the bond issues authorized and attempted to be authorized by said session, amount to more than the sum of $774,000, and will probably reach a sum greater than $874,000. That in addition to the said specific appropriations above named, and the general appropriation for sugar bounties in an unnamed and unascertained amount, and in addition to the $163,000 bond issue attempted to be authorized by said seventh session, said session authorized, or attempted to authorize, the further issue of the bonds of this state in amounts and for purposes as follows, to wit: Idaho Industrial Reform School bonds (Acts 1903, pages 17 and 192), $50,000; Idaho Academy building fund bonds (Acts 1903, page 51), $30,000; Albion Normal School building fund bonds (Acts 1903, page 209), $12,000; University of Idaho building fund bonds (Acts 1903, page 433), $43,000; penitentiary building fund bonds (Acts 1903, page 440), $20,000; for supreme court building at Lewiston (Acts 1903, page 44), $15,000; making a total of bond issues, including the issue authorized or attempted to be authorized by the act of March 16, 1903, total the sum of $333,000. That the total expenditures which the said seventh session of the legislature assumed to authorize, leaving out the unascertained amount of sugar bounties attempted to be authorized by the act of March 11, 1903, popularly known as the sugar bounty act, amount to the sum of $1,007,829.56, and which, added to the outstanding indebtedness and liabilities of the state at the time of the passage and approval of all of said acts, makes the liabilities of the state assumed to be authorized by the legislature reach the sum of $1,760,439.10, to be increased from one to two hundred thousand dollars by said sugar bounties under said sugar bounty act in violation of the constitution of Idaho, sections 1 and 2, article 8.

"The affiant says that he has no other plain, speedy or adequate remedy to obtain the relief herein sought. That unless

speedily restrained and prohibited by orders and process of this honorable court, the said defendants, acting in their respective official capacities, will wrongfully and unlawfully issue, register and cause to be registered in the state auditor's office, sold and invested in the school funds of the state further bonds of the state, under the above-mentioned bond acts, whereby the petitioner and other taxpayers of the state of Idaho will suffer great and irreparable injury, and the good name of the state and its credit will thereby be jeopardized and impaired to the injury and damage of the plaintiff and all of the taxpayers of the state."

The allegations of the first cause of action are made parts of the second, third and fourth causes of action respectively, and in addition thereto the second cause of action alleges the invalidity and unconstitutionality of an act approved February 16, 1903, and entitled "An act to establish the Idaho Industrial Reform School, etc." (Sess. Laws 1903, p. 12.)

The third cause of action alleges the invalidity and unconstitutionality of an act approved March 16, 1903, entitled "An act providing for issuance of state bonds for the erection and equipment of an armory and gymnasium, the equipment of the mechanical and electrical engineering, the equipment of the department of domestic science, and for the provision of a water supply; and providing how such bonds shall be issued and how the proceeds of the sales of such bonds shall be expended." (Sess. Laws 1903, p. 433.)

The fourth cause of action alleges the invalidity and unconstitutionality of an act approved March 11, 1903, entitled "An act to provide for the issuance of state bonds to improve the Idaho State Penitentiary and secure and furnish water for the same." (Sess. Laws 1903, p. 440.)

Upon the filing of this petition the plaintiff was required to give notice to the defendants, and upon the day set for hearing the defendants filed their special demurrer, which is as follows:

"Come now the defendants above named and demur to the affidavits and petition of the plaintiff herein, and for grounds of demurrer allege:

"1. That the said petition fails to set forth a cause of action entitling the plaintiff to the relief prayed for in said petition, or to any relief against these defendants, or either of them, acting in their official capacities or otherwise.

"2. Defendants demur to the first cause of action set forth in said petition on the ground that said cause of action fails to state facts constituting a cause of action or entitling the plaintiff to the relief prayed for in said petition, or to any relief against the said defendants, or either of them, either acting in their official capacity, as set forth in said cause of action, or otherwise.

"3. Defendants further demur to the first cause of action set forth in the said petition for the following reasons, to wit:

"a. The said first cause of action fails to show that there will be insufficient funds derived from other sources which, added to the general tax levy for the years 1903 and 1904, will equal all appropriations provided by the legislature for said years, as required by article 11, section 7 of the state constitution; and further, the said cause of action fails to show that there will be no other revenues provided for meeting the appropriations for said years in addition to the tax levy therefor.

"b. The said first cause of action fails to show the outstanding bonded indebtedness of the state, 'exclusive of the debt of the territory at the date of its admission,' and exclusive of warrant indebtedness to meet which cash revenues from tax levies, or from other sources, have been provided, and further, because the said cause of action fails to show that the limit of indebtedness fixed by section 1, article 8 of the constitution now is, or at any time has been, exceeded.

"c. The said first cause of action fails to show what portion, if any, of said outstanding indebtedness, to wit, the sum of $752,619.54 was legally chargeable against the debt limitation contained in section 1, article 8 of the state constitution; and the said cause of action further fails to show that no part of said alleged indebtedness has been paid.

"d. Defendants further specially demur to that portion of the first cause of action relating to the construction of 'a steel bridge across Snake river,' and 'the construction of a wagon

road in the counties of Boise and Idaho,' and the respective acts of the legislature relating thereto, for the reason that the said cause of action shows that the acts of the legislature relating to said subjects, the titles to which are set forth in said cause of action, are not local or special laws within the inhibition contained in the state constitution with reference to the enactment of local and special laws, and for the further reason that the said cause of action fails to show that said acts of the legislature are either local or special within said constitutional inhibition.

"e. Defendants further specially demur to that portion of the first cause of action relating to the payment of bounties upon sugar produced within the state during the years 1903 and 1904 from beets grown in the state under the provisions of the act of March 11, 1903, relating thereto, because the said cause of action fails to show that the defendants, or either of them, have either threatened to issue, or that they intend to issue and register, or cause to be registered, in the state auditor's office the bonds of the state for the purpose of paying said bounty provided by said act, or any part thereof; because the state and plaintiff under the allegations of the petition cannot be injured by the issuance of such bonds, and because the said cause of action shows upon its face that the defendants herein have no control over the investment of the school funds of the state either in said bonds or otherwise.

"f. Defendants further demur to said cause of action because the matters of record therein relating to the bonded indebtedness and the warrant indebtedness of the state are alleged and set forth upon information and belief.

"g. Defendants further demur to said cause of action because the same is ambiguous, uncertain and unintelligible in this, that it fails to show upon what ground the said plaintiff petitions for a writ of mandate herein, and because the said cause of action fails to show that the indebtedness of the state at the time of the filing of the petition exceeded one and one-half per cent of the assessed value of the taxable property in the state, and further, defendants demur because two or more causes of action have been improperly united in said first cause of action.

"h. Defendants further demur to said first cause of action because this court has no jurisdiction to issue the writ herein against the said defendants, or either of them.

"4. Defendants demur to the second cause of action set forth in said petition on the ground that said cause of action fails to state facts constituting a cause of action, or entitling the plaintiff to the relief prayed for in said petition, or to any relief against the said defendants, or either of them, either acting in their official capacity, as set forth in said cause of action, or otherwise.

"5. Defendants further demur to the second cause of action set forth in the said petition for the following reasons, to wit:

"a. It is impossible to determine what portion of the allegations and statements made in the first cause of action or count herein are properly applicable to this cause of action, which said allegations and statements are repeated, reiterated and adopted as part of the said second count or cause of action.

"b. The said second cause of action fails to show that there will be insufficient funds derived from other sources, which, added to the general tax levy for the years 1903 and 1904, will equal all appropriations provided by the legislature for said years, as required by article 11, section 7 of the state constitution; and further, the said cause of action fails to show that there will be no other revenues provided for meeting the appropriations for said years in addition to the tax levy therefor.

"c. The said second cause of action fails to show the outstanding bonded indebtedness of the state, 'exclusive of the debt of the territory at the date of its admission,' and exclusive of warrant indebtedness to meet which cash revenues from tax levies, or from other sources, have been provided; and further, because the said second cause of action fails to show that the limit of indebtedness fixed by section 1, article 8 of the constitution now is, or at any time has been, exceeded.

"d. The said second cause of action fails to show what portion, if any, of said outstanding indebtedness, to wit, the sum of $752,619.54, was legally chargeable against the debt limitation contained in section 1, article 8 of the state constitution; and the said cause of action further fails to show that no part of said alleged indebtedness has been paid.

"e. Said cause of action fails to show that the defendants, or either of them, have either threatened to issue, register or cause to be registered, or that they intend to issue, and register and cause to be registered in the state auditor's office the bonds of the state as provided in the act entitled 'An act to establish the Idaho Industrial Reform School, etc.,' and the act amendatory thereof, which said acts are specially referred to in said second cause of action; and further, because the state and the plaintiff under the allegations contained in said second cause of action, cannot be injured by the issuance of such bonds, and because the said cause of action shows upon its face that the defendants herein have no control over the investment of the school funds of the state, either in said bonds or otherwise.

"f. Defendants further demur to said second cause of action because the matter of record therein relating to the bonded indebtedness and the warrant indebtedness of the state are alleged and set forth upon information and belief.

"g. Defendants further demur to the third cause of action because this court has no jurisdiction to issue the writ herein against the defendants or either of them.

"6. Defendants demur to the third cause of action set forth in said petition on the ground that said cause of action fails to state facts constituting a cause of action, or entitling the plaintiff to the relief prayed for in said petition, or to any relief against the said defendants or either of them, either acting in their official capacity, as set forth in said cause of action, or otherwise.

"7. Defendants further demur to the third cause of action set forth in the said petition, for the following reasons, to wit:

"a. It is impossible to determine what portion of the allegations and statements made in the first cause of action or count herein are properly applicable to this cause of action, which said allegations and statements are repeated, reiterated and adopted as part of said third count or cause of action.

"b. The said third cause of action fails to show that there will be insufficient funds derived from other sources, which, added to the general tax levy for the years 1903 and 1904, will equal all appropriations, provided for by the legislature for

said years, as required by article 11, section 7 of the state con-
stitution; and further, the said cause of action fails to show
that there will be no other revenues provided for meeting the
appropriations for said years in addition to the tax levy there-
for.

"c. The said third cause of action fails to show the outstand-
ing bonded indebtedness of the state, 'exclusive of the debt of
the territory at the date of its admission,' and exclusive of war-
rant indebtedness, to meet which cash revenues from the tax
levies, or from other sources, have been provided; and further,
because the said third cause of action fails to show that the
limit of indebtedness fixed by section 1, article 8 of the con-
stitution is now, or at any time has been, exceeded.

"d. The said third cause of action fails to show what por-
tion, if any, of said outstanding indebtedness, to wit, the sum
of $752,619.54, was legally chargeable against the debt lim-
itation contained in section 1, article 8 of the state consti-
tution; and the said cause of action further fails to show that
no part of said alleged indebtedness has been paid.

"e. Said cause of action fails to show that the defendants,
or either of them, have either threatened to issue, register or
cause to be registered, or that they intend to issue, and regis-
ter and cause to be registered in the state auditor's office the
bonds of the state, as provided in the act of March 16, 1903,
the title of which is set forth in said third cause of action;
and further, because neither the petitioner nor the state, under
the allegations contained in said third cause of action, can be
injured by the issuance of such bonds, and because the said
cause of action shows upon its face that the defendants herein
have no control over the investment of the school funds of the
state, either in said bonds or otherwise.

"f. Defendants further demur to said third cause of action
because the matters of record therein relating to the bonded
indebtedness and the warrant indebtedness of the state are al-
leged and set forth upon information and belief.

"g. Defendants further demur to said third cause of action
because this court has no jurisdiction to issue the writ herein
against the said defendants or either of them.

"8. Defendants demur to the fourth cause of action set forth in said petition on the ground that said cause of action fails to state facts constituting a cause of action, or entitling the plaintiff to the relief prayed for in said petition, or to any relief against the said defendants, or either of them, either acting in their official capacity, as set forth in said cause of action, or otherwise.

"9. Defendants further demur to the fourth cause of action set forth in the said petition, for the following reasons, to wit:

"a. It is impossible to determine what portion of the allegations and statements made in the first cause of action or count herein are properly applicable to this cause of action, which said allegations and statements are repeated, reiterated and adopted as part of said fourth count or cause of action.

"b. The said fourth cause of action fails to show that there will be insufficient funds derived from other sources which, added to the general tax levy for the years 1903 and 1904, will equal all appropriations provided for by the legislature for said years, as required by article 11, section 7 of the state constitution; and further, the said cause of action fails to show that there will be no other revenue provided for meeting the appropriations for said years in addition to the tax levy therefor.

"c. The said fourth cause of action fails to show the outstanding bonded indebtedness of the state, 'exclusive of the debt of the territory at the date of its admission,' and exclusive of warrant indebtedness, to meet which cash revenues from the tax levies, or from other sources, have been provided; and further, because the said fourth cause of action fails to show that the limit of indebtedness fixed by section 1, article 8 of the constitution is now, or at any time has been, exceeded.

"d. That said fourth cause of action fails to show what portion, if any, of said outstanding indebtedness, to wit, the sum of $752.619.54, was legally chargeable against the debt limitation contained in section 1, article 8 of the state constitution; and the said cause of action further fails to show that no part of said alleged indebtedness has been paid.

"e. Said cause of action fails to show that the defendants, or either of them, have either threatened to issue, register or cause

to be registered, or that they intend to issue and register and cause to be registered in the state auditor's office the bonds of the state, as provided in the act of March 11, 1903, the title of which is set forth in said fourth cause of action; and further, because neither the petitioner or the state, under the allegations contained in said fourth cause of action, can be injured by the issuance of such bonds, and because the said cause of action shows upon its face that the defendants herein have no control over the investment of the school funds of the state, either in said bonds or otherwise.

"f. Defendants further demur to said fourth cause of action because the matters of record therein relating to the bonded indebtedness and the warrant indebtedness of the state are alleged and set forth upon information and belief.

"g. Defendants further demur to said fourth cause of action because this court has no jurisdiction to issue the writ herein against the said defendants or either of them.

"10. Defendants further demur generally to said petition, and the whole thereof, because the same is unintelligible and uncertain, in this, that it raises the question of the validity of several legislative acts providing for bond issues, and several legislative acts carrying appropriations, and does not properly set forth the outstanding indebtedness of the state, does not show which particular act providing for said bond issues is in excess of the debt limitation fixed by the constitution, neither does said petition show what particular act carrying an appropriation is in excess of the appropriation limit fixed by section 11, article 7 of the state constitution.

"11. Defendants generally demur to said petition, because this court has no jurisdiction to issue the writ of prohibition herein.

"Wherefore, defendants pray that plaintiff's writ may be denied, that the petition herein may be dismissed, and for their costs herein."

Upon the issues thus made the arguments were heard on the part of the respective parties.

AILSHIE, J. (After making the statement.)—It is insisted on the part of the plaintiff in this case that the legisla-

ture has violated the provisions of section 11, article 7 of the constitution in that they have made appropriations for the years 1903 and 1904 in excess of the tax levy which they provided for those years. Section 11, article 7 of the constitution is as fol-. lows: "No appropriation shall be made, nor any expenditure authorized by the legislature, whereby the expenditure of the. state during any fiscal year shall exceed the total tax then provided for by law, and applicable to such appropriation or expenditure, unless the legislature making such appropriation. shall provide for levying a sufficient tax not exceeding the rates allowed in section nine (9) of this article, to pay such appropriation or expenditure within such fiscal year. This provision shall not apply to appropriations or expenditures to suppress insurrection, defend the state, or assist in defending the United States in time of war."

An examination of the appropriation acts shows that the total appropriation made by the seventh biennial legislative session was $674,375.56, and that the tax levy provided to cover the same period of time, namely, 1903 and 1904, is $550,000. The question arises: Is this appropriation contrary to the provisions of section 11 above quoted? Article 7 was entitled by the framers of the constitution as follows, "Finance and Revenue," and section 2 thereof recognizes three distinct methods of raising *tax*, namely, a property tax, a license tax and a *per capita* tax, and hence it appears that the framers of the constitution contemplated other means of raising revenue than by the levy of a tax. It will also be seen from an examination of section 19, article 4 of the constitution that the framers of that instrument acknowledged a still further means of securing to the state treasury public funds. That section provides, among other things, that "No officer named in this section shall receive for the performance of any official duty any fee for his own use; but all fees fixed by law for the performance by either of them of any official duty shall be collected in advance, and deposited with the state treasurer quarterly to the credit of the state." The constitution therefore recognizes three separate and distinct methods by which the state acquires revenue other than by the levy of a property tax. It is not to be presumed

that these funds are intended to be hoarded away in the state treasury but must have been intended to be used in defraying the general expenses of the government.

It does not appear from the petition in this case how much of such fund, if any, was in the state treasury nor how much will come into the state treasury during the two years for which the legislature has made its appropriation. It is fair to assume that in making their appropriations they estimated the amount of revenue the state would derive from all other sources than that of a tax levy, and that they made their tax levy sufficient to cover the difference. Until the contrary is shown we must presume that the legislature kept within the constitutional limitation in this respect. The courts must take judicial knowledge of one provision of the constitution as well as another, and likewise of the statutes of the state, and by this means knowing judicially that revenues come into the treasury from other sources than by a tax levy, we cannot say that the legislature have made appropriations in excess of the constitutional limitation.

It is next urged that the appropriations made and the expenditures authorized by the seventh biennial legislative session added to the prior and then existing liabilities and debts of the state make a total exceeding one and one-half *per centum* of the total assessed valuation of the property in the state contrary to the provisions of section 1, article 8 of the constitution. That section provides as follows: "The legislature shall not in any manner create any debt or debts, liability or liabilities which shall singly or in the aggregate, exclusive of the debt of the territory at the date of its admission as a state, exceed the sum of one and one-half *per centum* upon the assessed value of the taxable property of the state except in case of war, to repel an invasion or suppress insurrection," etc.

The principal question discussed on this point is as to whether or not the appropriations made for the two years succeeding the adjournment of the session became a debt within the meaning of section 1, article 8. It is urged by the plaintiff that these appropriations became *debts* or *liabilities* against the state, and must be added to the bonded and other indebted-

ness of the state in ascertaining whether or not the constitutional limitation has been exceeded. Defendants take the position that under the general scheme of finance and revenue provided for in article 7, that the business of the state is placed upon a cash basis, and that the ordinary expense of maintaining and carrying on the state government is provided for from year to year as the expense is incurred, and that in contemplation of the constitution the money is in the treasury to meet the bills as soon as they are audited and allowed, and that the auditor's warrant on the treasurer is simply the constitutional method of taking the money from the state treasury and applying it to the payment of such bill. Upon this point plaintiff relies on *People v. Johnson,* 6 Cal. 499, and *Nougues v. Douglas,* 7 Cal. 65. In these authorities it seems that the supreme court of California took the position that under the provisions of article 8 of the constitution of that state, which contains substantially the same provision as section 1 of our article 8, the appropriations for the current expense of the state government were a debt and should be computed in ascertaining whether the legislature had exceeded the constitutional limitation. An examination of the later authorities of that state shows, however, that the court soon departed from the rules announced in the two former decisions upon this particular point, and in *State v. McCauley,* 15 Cal. 430, Chief Justice Field said: "The eighth article was intended to prevent the state from running into debt, and keep her expenditures, except in certain cases, within her revenues. These revenues may be appropriated in anticipation of their receipt as effectually as when actually in the treasury. The appropriations of the moneys, when received, meet the services as they are rendered, thus discharging the liabilities as they may arise, or rather anticipating and preventing their existence. The appropriation accompanying the services operates in fact in the nature of a cash payment." This last case was followed and approved by the same distinguished jurist in *McCauley v. Brooks,* 16 Cal. 24, and *Koppikus v. State Capitol Commission,* 16 Cal. 249. These authorities were in turn approved by Mr. Justice Sawyer in the able and well-considered case of *People v. Pacheco,* 27

Cal. 176. The same position was sustained and the latter authorities approved in *McBean v. Fresno,* 112 Cal. 167, 53 Am. St. Rep. 191, 44 Pac. 358, 31 L. R. A. 794. It is worthy of observation that nowhere is there to be found in the constitution of California, either as adopted in 1849 or as amended in 1862, any provision corresponding to our section 11, article 7. There was no provision in the California constitution requiring the business of the state to be conducted upon a cash basis or prohibiting the legislature from making any appropriation unless they first provided for the raising of sufficient revenue to meet the same. A careful examination of articles 7 and 8 of our constitution discloses two separate and distinct purposes had in view in the adoption of the two articles. Article 7 defines the fiscal year, provides methods for raising revenue, exempts certain classes of property from taxation, provides for uniformity of taxation, fixes a maximum rate of taxation upon real and personal property that shall never be exceeded, provides for appropriations for current expenses, for a board of equalization and for a system of county finances. The complete plan outlined in this article provides for the raising of revenue to meet the current expenditures. When legislative appropriations are made they are made for the future and to extend over a period of two years. During the time for which the expenditures are being made the revenue is being collected, and even though claims may be presented and allowed before sufficient revenue has been collected to meet the same, the complete scheme for the collection of taxes and revenue and the payment of the current expenses of the state looks to one general purpose of ending the two years for which appropriations are made with the expenses of maintaining the state government for that period paid. On the other hand, article 8 contemplates the contracting of indebtedness, the issuance of state bonds, prohibits the loaning of the state's credit to individuals and corporations, etc. This article, differing from the other, was entitled by the framers of the constitution thus: "Public Indebtedness and Subsidies." Between the two extremes—the one meeting the expenditure for maintenance of the state govern-

ment, and the other meeting the expenses in case of war, to repel invasion or suppress insurrection—the constitution has anticipated a necessity which must arise of making public improvements, erecting public buildings, educational, penal and re-, formatory institutions, and that for the construction of the same the state would necessarily be obliged to incur indebtedness. It authorizes the legislature to create debts not to exceed one and one-half *per centum* upon the assessed valuation of the taxable property therein. In *State v. Medbery,* 7 Ohio St. 522, Mr. Justice Swan, in discussing provisions found in the constitution of Ohio to the same effect as those contained in our constitution, said: "The General Assembly usually, however, provide for the current expenses for a period not exceeding two years, out of the incoming revenues, by making appropriations of a sufficient amount of money to pay the expenses during that period, and provide by law for the raising of revenue sufficient to meet the appropriations.

"The discretion of each General Assembly for the period of two years in respect to the amount of expenditures, except in some special cases relating to salaries, is without limit and without control; but each must provide revenue and set apart sufficient by a law operative within the same two years, to pay all expenses and claims.

"This is the general system provided by the constitution. (Art. 2, sec. 22; art. 12, sec. 4.) Under it, all the claims which are authorized, or which can accrue within each of the two years and their payment formed one governmental and financial transaction; so that, at the end of each of the two fiscal years, the expenditures authorized and liabilities incurred have been provided for by revenue, adjusted by the executive officers, and, out of the revenue previously set apart and appropriated, are paid.

"So long as this financial system is carried out in accordance with the requirements of the constitution, unless there is a failure or deficit of revenue, or the General Assembly have failed for some cause to provide revenue sufficient to meet the claims against the state, they do not and cannot accumulate into a debt. Under this system of prompt payment of expenses and

claims as they accrue, there is, undoubtedly, after the accruing
of the claim, and before its actual presentation and payment,
a period of time intervening, in which the claim exists unpaid;
but to hold that for this reason a debt is created, would be the
misapplication of the term 'debt,' and substituting for the fiscal
period a point of time between the accruing of a claim and its
payment, for the purpose of finding a debt; but appropriations;
having been previously made and revenue provided for payment
as prescribed by the constitution, such debts, if they may be so
called, are, in fact, in respect to the fiscal year, provided for,
with a view to immediate adjustment and payment. Such finan-
cial transactions are not, therefore, to be deemed debts."

The same conclusion is reached by the supreme court of
Nevada in *Ash v. Parkinson,* 5 Nev. 15.

It seems to us that the provisions of articles 7 and 8 of the
constitution in this respect are clear and explicit. The appro-
priations for current expenses and the raising of revenue to
meet those appropriations have been treated by the people in
framing and adopting the organic law as a cash transaction.

Based upon the plaintiff's showing of the assessed valuation
of the state it would authorize a state indebtedness ex-
ceeding $900,000 as permitted by article 8. Deducting
the biennial appropriation provided by the legislature for
the current expenses of the state from the total as set forth
by the plaintiff in his petition and the balance falls short of the
debt limit prescribed by the constitution. A large portion of
the remaining indebtedness, however, is not an obligation
against the state to be met by taxation or any other method
of raising revenue, but is payable out of the interest from per-
manent funds derived from donations made by the general
government upon our admission as a state.

For the foregoing reasons it will be seen that the petition
herein does not state facts sufficient to entitle the plaintiff to
the relief prayed for.

In *Re Francis,* 7 Idaho, 98, 60 Pac. 561, this court said: "Upon
application for a writ of prohibition, the petition must show
all facts necessary to entitle a petitioner to a writ, and if it
does not, the writ will be denied."

: We cannot dispose of this case without a consideration of the question of jurisdiction raised by the demurrer and argued at length in the briefs. This has been characterized as *technical,* and may therefore, upon that assumption, be said to belong to that large class of defenses so generally designated by defeated litigants as *technical,* but it has been our uniform observation, however, that this oft-dubbed fragile hope and defenseless defense is seized alike by all with an astonishing facility when it becomes available to them in the course of litigation. It is not out of place here to observe that the courts cannot disregard the provisions of the constitution and statutes, matter not what the character of the defense may be.

It is urged that this court has no jurisdiction to issue the writ of prohibition prayed for in this case, and that the issuance of the same would be an invasion by judicial writ of another and independent branch of the state government, and an attempt to control executive and administrative power and authority. In the course of argument upon this position the attorney general contends that the writ of prohibition will not lie to the chief executive, for the reason that the judicial department cannot control, or assume to control, his acts, and that an attempt to do so would be futile for the reason that if the governor should refuse to obey the writ from the court, there would be no way to enforce a compliance therewith. He suggests that under the constitution the governor is commander in chief of the militia of the state, and that in case of a conflict between the authority vested in the judicial department, and that vested in the executive department the courts are left under the constitution without authority to enforce such writs, and that therefore it must be presumed that no such power and authority is vested in the judiciary. Upon this particular question there seems to have been considerable said by the courts and text-writers. In 16 Encyclopedia of Pleading and Practice, page 1168, the author says: "The three branches of government are independent and co-ordinate, and the courts have no authority to send the writ of prohibition to other branches than the judicial. It will therefore be refused where its object is to restrain the action of legislative bodies or executive officers."

High, in his work on Extraordinary Legal Remedies, second edition, at section 783, says: "Prohibition will not lie against the governor of the state to restrain him from granting a commission to a person claiming to be duly elected to a public office. The grounds on which the relief is refused in such a case are, that the judiciary have no power to invade the province of the executive, the three departments of government under our system being distinct and independent, and that prohibition is in no event the fit remedy to restrain the head of the executive department in the execution of his duties." To the same effect is Shortt on Extraordinary Remedies, at page 491, where he says: "The proceedings to be prohibited must be of a judicial character. A prohibition would not be granted in respect of any proceeding belonging to the executive government of the country." To this general effect we find much authority. It seems to us that to keep within the spirit of our constitution (section 1, article 2) and form of government which recognizes the independence and specific character of the "three distinct departments" of government, that the judicial department could not attempt to prohibit either of the other departments from *acting* within the recognized scope of their respective branches of the government, but that on the other hand the legal effect of such action after it has been taken may be inquired into by the court.

In this connection the question has been directly and specifically raised as to whether or not under the constitution and laws of this state the writ of prohibition will issue to enjoin the commission of ministerial and administrative acts. In support of the position that the writ will issue in such case, we are cited to *Williams v. Lewis,* 6 Idaho, 184, 54 Pac. 619, where this court said: "The writ of prohibition, under the statutes of Idaho, will lie to restrain the action of a ministerial officer when it appears that such action is illegal and beyond his jurisdiction." Counsel for defendant contend that this case is contrary to the great weight of authority announced in nearly, every other state in the Union, and ask us to overrule it in so far as it announces the doctrine above quoted. After careful examination of that case and the pleadings which were before the court, it seems to us that the doctrine announced to the

effect that the writ would lie to restrain the action of minis-
terial officers was unnecessary to a determination of the issues
involved and to that extent is *dictum.* The question there in-
volved was the filing and certifying by the Secretary of State
two separate tickets presented to him by two distinct political
organizations, each representing itself to be the "People's
Party." Under the law the secretary could not file and certify
but one ticket in the name of any one political party. He was
therefore in that case called upon to exercise *quasi* judicial
functions and determine which of the two tickets was the ticket
nominated by the real, genuine, accepted "People's Party."
When we call to mind the distinguished and able judges who
constituted the court when *Williams v. Lewis* was decided, we
feel some reticence in a re-examination of the question there
discussed, but the conclusion announced as to the office of the
writ as contemplated under the constitution is in such apparent
conflict with the great weight of authority that we have deemed
ourselves justified in making an original investigation of that
question. Section 9, article 5 of the constitution provides that:
"The supreme court shall also have original jurisdiction to is-
sue writs of *mandamus, certiorari,* prohibition and *habeas cor-
pus.*" This provision seems to have been taken literally from
section 4 of article 6 of the constitution of California. The
same provision was contained in the constitution of California
as adopted in 1849 and again as adopted in 1862, and was
finally readopted in the constitution of 1879. The legislature
of California in defining the writ of prohibition, at section
1102, Code of Civil Procedure, used the identical language
which was copied by our legislature and adopted as section
4994 of our Revised Statutes. The supreme court of Cali-
fornia, in considering the extent and scope of the writ as used
in the constitution and statutes of that state, held uniformly
that the common-law writ was meant.

In *Maurer v. Mitchell,* 53 Cal. 289, the court considered the
statutory definition of the writ and the language used in that
connection, and construed it in such a clear and convincing
way, that we quote at length from that opinion. It says:

"Giving the words of the last clause of the section their

natural construction in view of the law when the section was adopted, there would be no difficulty in holding that the 'corporation, board or person' mentioned was a corporation, board, or person clothed with limited *judicial* powers which had been exceeded. The word 'jurisdiction,' when used in connection with 'prohibition,' would be at once understood as being employed in the sense of the legal power or authority 'to hear and determine causes.' It is said, however, that the first clause of the section can only be given effect by extending prohibition so as to arrest every unauthorized act of an officer or person clothed with authority, as *mandamus* may be employed to compel the performance of any act enjoined by law, with the condition in each case that the party has no other plain, speedy and adequate remedy. But that prohibition as a remedy is not in every respect the exact converse of *mandamus* is made apparent by the words of the second clause of the same section, which declare that prohibition arrests *proceedings* which *are* without or in excess of the jurisdiction. In prohibition it must be shown to the court that the inferior court or person *has* exceeded the powers conferred by law, and the court intervenes to prevent further proceedings without or in excess of such power. *Mandamus* may be resorted to whenever an officer or person refuses to perform a duty enjoined by law, although the act may have been an isolated one, disconnected with any proceedings leading up to that which the recalcitrant official or individual refused to perform.

"In what sense, then, is the word 'counterpart' employed in the first clause of the section? As it cannot be given the meaning of the exact reverse or opposite without doing away with the limitation contained in the second clause, whereby prohibition is confined to the cases in which the court, corporation, officer, or person has already exceeded the powers conferred by law, it must have been used in the more general sense, that prohibition is the opposite, in that it *arrests* while *mandamus commands* action.

"The word 'counterpart' as employed in the statute is designed to illustrate the operation of the writ of prohibition when issued in a proper case, but it is not intended to enlarge or add to the class of cases in which it may be resorted to."

In defining the writ at section 4994, Revised Statutes, it is said that "it arrests the *proceedings*" when they are "without or in excess of the *jurisdiction*" of the tribunal, corporation, board or person about to exercise the *jurisdiction.* Jurisdiction, as used in the law, is the right to hear and determine a matter, and carries with it the idea of exercising judicial or *quasi* judicial functions. (See "Jurisdiction," Black's Law Dictionary; Bouvier's Law Dictionary, and authorities there cited.). The word *"proceedings"* as here used cannot reasonably be said to apply or have reference to the doing of a purely ministerial act.

In 1881, and after the decisions reported in the 52d and 53d Cal. had been announced the legislature of California amended section 1102 of their Code of Civil Procedure by adding thereto the words "Whether exercising functions judicial or *ministerial.*" In *Camron v. Kenfield,* 57 Cal. 550, the court held that the amendment was unconstitutional, for the reason that the word *"prohibition"* had been used in the constitution in the common-law sense of that term, and that it was beyond the power of the legislature to extend the scope of the writ by legislative definition. This last case seems to have become the settled doctrine in that state and has been repeatedly cited with approval, not only by the courts of that state, but by the highest courts of other states, and it is clear to us that the reasoning of the case and the principle there announced was misapprehended and misapplied in *Williams v. Lewis.* In the Williams case the court seems to have taken the view that under sections 4994 and 4995, Revised Statutes, the territorial legislature had extended the scope and province of the writ, and in support of that position cites section 1866 of the Revised Statutes of the United States, which provided that the original and appellate jurisdiction of the territorial courts should be *limited* by law. When the act of Congress provided that the jurisdiction of the territorial courts should be *limited* by law, it was certainly not the intention to authorize the *extension* of the use of the writ of prohibition within the territorial jurisdiction beyond in excess of the scope and power of the writ as uniformly recognized by the federal courts.

At common law the writ of prohibition was issued on the suggestion that the cause originally, or some collateral matter arising therein, did not belong to the inferior jurisdiction, but to the cognizance of some other court. "It was an original remedial writ provided as a remedy for encroachment of jurisdiction; its office was to restrain subordinate courts and inferior judicial tribunals from extending their jurisdiction." (3 Shars. Blackst. Com. 112; *Quimbo Appo v. People,* 20 N. Y. 540; *Thomas v. Mead,* 36 Mo. 232; *Spring Valley W. W. v. San Francisco,* 52 Cal. 117; *Maurer v. Mitchell,* 53 Cal. 291.) Now, the question arises: With the federal courts using the writ in its common-law sense and the supreme court of California holding that the word *"prohibition"* as used in the constitution and statutes of California had been used in the common-law sense, in what sense shall we conclude that the framers of the Idaho constitution used the word *"prohibition"* when incorporating the same into the organic law of this state? When a statutory or constitutional provision is adopted from another state, where the courts of that state have placed a construction upon the language of such statute or constitution, it is to be presumed that it was taken in view of such judicial interpretation and with the purpose of adopting the language as the same had been interpreted and construed by the courts of the state from which it was taken.

We therefore arrive at the contrary conclusion from that reached in *Williams v. Lewis,* and are of the opinion that the writ of prohibition as authorized by the constitution is the common-law writ, and that the same will not issue to restrain purely ministerial acts. The case of *Williams v. Lewis* is therefore expressly overruled in so far as it holds that the writ of prohibition will lie to restrain ministerial acts. No costs to be taxed in this case.

For the foregoing reasons the writ applied for will be denied and the petition dismissed.

Sullivan, C. J., and Stockslager, J., concur.