———o———

(February 2, 1911.)

## CURTIS F. PIKE, Plaintiff, v. STATE BOARD OF LAND COMMISSIONERS, Defendant.

[113 Pac. 447.]

CONSTITUTIONAL CONSTRUCTION—PUBLIC SCHOOLS—SCHOOL LANDS—TIMBER LANDS—LEASE OF STATE LANDS—SALE OF STATE LANDS—PUBLIC POLICY.

(Syllabus by the court.)

1.   The words "school lands" as used in sec. 8 of art. 9 of the constitution, wherein it is provided, "that not to exceed twenty-five sections of school lands shall be sold in any one year, and to be sold in subdivisions of not to exceed one hundred and sixty acres to any one individual, company or corporation," has reference only to secs. 16 and 36 in each township, and does not include or embrace lands granted by Congress to the state for specific educational purposes such as university, normal school, agricultural college, and scientific and other institutions of higher learning. And the constitution, sec. 8, art. 9, does not limit the amount of state lands that may be sold within any year, except as the foregoing prohibition applies to secs. 16 and 36 in every township commonly known and designated as "school lands" and which were granted to the state for the use of the public, free common schools of the state.

2.·  The word "school" as used in secs. 5 and 8 of art. 9 of the constitution, has reference to the public, free common schools, and clearly means the free school system which has been generally adopted in this country, and has specific reference to the district schools throughout the state established for the training and instruction of the youth of the state in the primary and elementary branches

of learning below the grade or rank of "academy, seminary, college, university, or other literary or scientific institution."

3.    State land covered with timber, which has been previously sold by the state and the purchaser has been granted a fixed period in which to enter upon the land and remove the timber, is timber land within the meaning of secs. 1580 and 1599 of the Rev. Codes, and when sold must be sold subject to the provisions of sec. 1599.

4.    Where the state sells the timber standing and growing on a tract of land and grants to the purchaser the right of possession for the period of twenty years from the date of sale for the purpose of cutting and removing the timber, and provides that all timbers that remain standing on the land at the expiration of the twenty years shall belong to the state, a subsequent sale of the land and grant of the fee by the state conveys to the purchaser all the timber that may remain standing upon the land at the expiration of the twenty-year period, and the purchaser of the timber has no further right after the expiration of that period to enter upon the land or remove timber, and has no further right in any timber on such land.

5.    The public policy of a state is to be gathered from its public history, the trend of its laws, and the conduct and practice of its public officials, executive, legislative and judicial, in the administration, construction and execution of its laws and the transaction of its public business.

6.    No public policy of this state has been disclosed to the court which is contrary or runs counter to the proposed action of the state board of land commissioners to sell state lands which have been leased for a period of twenty years, and of which lease there is still eleven years to run.

7.    The question as to whether or not it is expedient, wise or the best business policy for the state board of land commissioners to sell lands in fee while there is an outstanding lease on the same, and which lands cannot be occupied by the purchaser for a number of years after the sale and purchase, is a matter solely addressed to the judgment and discretion of the land board, and is vested in them by the constitution and statute, and is not a question that can be considered, reviewed or controlled by the courts.

8.    It is within the power and authority of the state land board to require a person, company or corporation that may apply to purchase state lands to enter into an agreement to bid a given price upon such lands in the event they are offered for sale as a condition precedent to advertising such lands for sale.

9.    Resolution adopted by the state land board in this case and agreement required of the company applying to purchase the lands in question examined, and *held,* that it was within the power and authority of the board to pass such resolution and require such

agreement, and that these were matters addressed solely to the judgment and discretion of the board.

Original action in this court by Curtis F. Pike for a writ of prohibition against the state board of land commissioners. Alternative writ was issued, and a hearing was had. Writ quashed and the action is dismissed. Costs awarded in favor of the defendant.

Jno. F. Nugent, Frank Martin, T. L. Martin, J. T. Pence, W. B. Davidson, F. B. Kinyon and J. R. Smead, for Plaintiff, file brief on points decided in this case as *amici curiae* in case of *State v. Hoover.*

D. C. McDougall, Attorney General, J. H. Peterson and O. M. Van Duyn, Assistants to the Attorney General, for the State Land Board, file brief covering points in this case in. *State v. Hoover.*

James H. Forney, John P. Gray and James E. Babb, as *Amici Curiae.*

The word "school," without something to indicate that a wider meaning was intended to be given to the word, will not be taken to indicate such higher institutions of learning as colleges or universities or institutions for the teaching of trades, professions or business. (Citing authorities cited in opinion.)

The sale of the timber under the act of 1899 carried the title to the same in fee subject to termination at the end of twenty years as to so much of the timber as might not theretofore have been removed. (*Midyette v. Grubbs,* 145 N. C. 85, 58 S. E. 795, 13 L. R. A., N. S., 278; *Warren v. Ash,* 129 Ga. 329, 58 S. E. 858; *French v. Sparrow-Kroll Lbr. Co.,* 135 Mich. 424, 97 N. W. 961.)

Any deed made by the state in pursuance to the sales now attempted to be made of the land will carry to the purchaser the timber that may be remaining on the land after the expiration of the twenty-year period for removal under the sales.

of the timber heretofore made. (*French v. Sparrow-Kroll Lbr. Co., supra; Strasson v. Montgomery,* 32 Wis. 52.)

There is a vested right and a right coupled with an interest where the person who is to take is ascertained, though the property to be taken may be uncertain. (24 Am. & Eng. Ency. of Law, 2d ed., 388, 389), and same may be transferred. (Id., pp. 390, 391.)

Where there has been a settled course of procedure in the land department based on a certain construction of the statutes, it becomes the duty of the court to accept that construction, even though it might have originally placed a different construction upon the statutes. (*Holt v. Murphy,* 207 U. S. 407, 28 Sup. Ct. 212, 52 L. ed. 271; *McMichael v. Murphy,* 197 U. S. 304, 25 Sup. Ct. 460, 49 L. ed. 766; *Hastings etc. R. R. Co. v. Whitney,* 132 U. S. 357, 10 Sup. Ct. 112, 33 L. ed. 363; *United States v. Moore,* 95 U. S. 760, 24 L. ed. 588; *United States v. Burlington etc. Ry. Co.,* 98 U. S. 341, 25 L. ed. 198; *Heath v. Wallace,* 138 U. S. 573, 582, 11 Sup. Ct. 380, 34 L. ed. 1063; *United States v. Alabama etc. Ry. Co.,* 142 U. S. 615–631, 12 Sup. Ct. 306, 35 L. ed. 1134; *Orchard v. Alexander,* 157 U. S. 383, 15 Sup. Ct. 635, 39 L. ed. 737; *Hewitt v. Schultz,* 180 U. S. 139, 156, 163, 21 Sup. Ct. 309, 45 L. ed. 463; *Louisiana v. Garfield,* 211 U. S. 70, 29 Sup. Ct. 31, 53 L. ed. 92.)

AILSHIE, J.—This is an original application filed in this court for a writ of prohibition against the state board of land commissioners, whereby the plaintiff seeks to restrain and prohibit the board from selling a large body of state lands situated in Latah and Nez Perce counties, comprising an aggregate area of 23,938.18 acres. These lands are a part of the several land grants made by the general government to this state on its admission into the Union. The specific grants, parts of which go to make up the total area of the tracts to be sold, are as follows: Scientific schools, state penitentiary, state normal school, charitable institutions, agricultural college, and insane asylum.

The lands proposed to be sold are timber lands, and it appears that in 1902 the state sold to the Potlatch Lumber Company, or rather to its predecessors in interest, all the timber standing and growing on this entire body of land, and issued state certificates to the purchaser therefor, conditioned that the purchaser, or his successor in interest, should have a period of twenty years from the date of the sale in which to remove the timber, and that all the timber which might remain on the lands at the expiration of that period should revert to the state. In June, 1910, the Potlatch Lumber Company made application to the state board of land commissioners to purchase these lands and asked the board to have the land appraised. On the 30th of June the board, after considering the matter, passed and adopted the following resolution:

"Whereas the Potlatch Lumber Company is the owner of the timber on several thousand acres of land, the fee to which still remains in the state of Idaho; and,

"Whereas all of said timber was heretofore sold to said Potlatch Lumber Company or its predecessors in interest, on condition that said timber should be removed within certain specified terms of years, and that all timber remaining on the land after the expiration of said term should revert to and become the property of the State of Idaho; and,

"Whereas said Potlatch Lumber Company has, in due form, applied to purchase the fee to 23,938.18 acres of State land on which it now owns the timber as aforesaid, to the end that they be not compelled to cut the timber from said premises in the limited time at its disposal under its timber deeds; and,

"Whereas said Potlatch Lumber Company has appeared before this board by its land agent, W. D. Humiston, and has made argument in favor of said application whereby it was shown to the satisfaction of this board that by granting said application, the forests of the state would be conserved and the water sheds better protected, the income of our wage earners augmented, the transportation facilities of the

state increased, the revenue from taxation maintained and the largest returns to the institutions of the state assured.

''Now, therefore, be it resolved, that the lands as specifically referred to in the application of the said Potlatch Lumber Company be forthwith appraised, and if the applicant shall thereupon execute a contract of purchase which shall recite its intent to bid on all of said land not less than its appraised value, and that in the event of being the successful bidder it shall and will carry through all payments of principal and interest to final payment or cause such payment to be made; said land shall be advertised and sold to the highest bidder in accordance with law, and that if the said Potlatch Lumber Company is the highest bidder when said lands are sold, the deeds of the State to said lands shall specifically set forth the intent of the state to release all its right, title and claim in and to any and all timber standing, lying and being on said lands at the expiration of the term given under the original timber deeds to the said Potlatch Lumber Company or its predecessors in interest or for the removal of the timber from lands covered by the application above referred to.''

Pursuant to the foregoing resolution, the land board sent out its appraiser who appraised this entire body of land at an average valuation of $10.58 per acre. After the appraisement was made, the board required the company, or its agent, to enter into a contract whereby it agreed to bid on this tract of land the full amount of the appraised valuation thereof, as a condition precedent to advertising the same for sale at public auction, and also required the company to make certain concessions with reference to relinquishing the company's right of possession to all lands from which it might remove the timber prior to the expiration of the twenty-year period. The company, through its agent, accordingly entered into the following agreement, which was filed with the board:

''Memorandum of Agreement, Made and entered into this 22d day of December, 1910, by W. D. Humiston, first party, with the State of Idaho, second party, Witnesseth: That,

"Whereas, the Potlatch Lumber Company did apply to the State of Idaho to purchase the fee of 24,096.16 acres of the State lands including the timber standing, lying or being thereon at the expiration of 20 years from the dates of the deeds respectively made for the timber thereon, which said application was made in due form, and,

"Whereas, the State Board of Land Commissioners ordered that the said property be appraised and sold at Moscow, and Lewiston, Idaho, respectively, and that if the Potlatch Lumber Company should thereupon execute a contract of purchase, which would recite its intent to bid on all of said property not less than its value as shown by such appraisal and that in the event of being the successful bidder it should and would carry through all payments of principal and interest to final payment, or cause such payments to be made, said lands should be advertised and sold to the highest bidder in accordance with law, and further ordered that if the Potlatch Lumber Company was the highest bidder when said lands were sold, the deeds of the State to said lands should specifically set forth the intent of the State to relinquish all of its right, title and claim in and to any and all timber standing, lying and being on said lands at the expiration of the term given under the original timber deeds to the Potlatch Lumber Company or its predecessors in interest for the removal of the timber from the lands covered by the application above referred to; and,

"Whereas, the sale of such thereof as is situated in the County of Latah, State of Idaho, has been fixed for the 28th day of December, 1910, and such thereof as is within the County of Nez Perce, State of Idaho, has been fixed for the 29th day of December, 1910:

"Now, therefore, in consideration of the premises and in the event the said first party shall become the purchaser of such property upon such sale and that second party shall cause to be made and executed unto the first party, his successors or assigns, a deed conveying said property in fee simple, together with all the right, title and claim of the State of Idaho, in and to any and all timber standing, lying

or being on said described lands at the expiration of the term given under the original timber deeds for said lands for the removal of the timber from the land so appraised;

"The said first party hereby agrees that he will bid at the sale of said property so appraised and to be advertised for sale, not less than $10.00 per acre, and not less than the appraised value of the property to be sold, and in the event of becoming the purchaser of any or all of said property that he will cause to be made all payments of both principal and interest covered by such bid or bids and as set forth in the certificate of sale to be issued therefor to first party, and will cause Potlatch Lumber Company to release to the second party within one year after the completion of logging operations on and over any lands the timber on which is now owned by Potlatch Lumber Company, and the fee to which is still in said State and which is not embraced in such application or any legal subdivision thereof, all the right, title and interest of Potlatch Lumber Company in and to any and all timber of every kind and variety remaining on said land, together with the right of occupancy thereof by said Lumber Company, reserving only to said company, its successors and assigns, the right to build, maintain and operate logging roads and spurs over and across the same for transporting timber and supplies together with the land on which logging camps are now situate and necessary for the convenient use thereof as well as the right to locate and operate other camps at other necessary or convenient places thereon from time to time."

The complaint alleges that a large part of this land is worth a great deal more than the appraised value, and that much of it is worth from $25 to $75 per acre. Paragraph 12 of the complaint alleges that the petitioner is informed and believes, and therefore alleges, that the board and the members thereof have secretly agreed with the Potlatch Lumber Company to sell, grant and convey to the company, to the exclusion of all other persons, "under the guise of said pretended auction, the said lands hereinbefore described, and to include in the deeds of said lands to said company a clause

whereby all timber standing, growing or being on said lands at the expiration of the leases of said company on the same, hereinbefore fully set out, shall be released to and become the property of the said Potlatch Lumber Company, thus causing great loss to the state of Idaho and the taxpayers and citizens thereof; that petitioner is advised and believes, and therefore alleges, that the said contemplated and threatened action of said board is in violation of and contrary to the laws of the state of Idaho, and of the provisions of sections 4, 7, and 8 of article 9 of the constitution of the state of Idaho."

At the hearing of this matter, the attorney general produced copies of the records of the proceedings of the land board, and subsequently the attorneys for the petitioner filed a statement to the effect that at the time of the commencement of this action the record had not been extended, and that they consequently had no sufficient knowledge or information as to what the real facts were, and hence the foregoing allegation. "That it is not now the intention of the petitioner to offer any evidence in this matter in proof of paragraph 12 of his said petition, or any part thereof, other than the records, files and agreements in regard to said matter, appearing in the office of the said defendant board, which will tend to show that the defendant board, or any of its members, had agreed with the Potlatch Lumber Company, or any other person, to reject any bid which might be made, which was higher than the bid of said Potlatch Lumber Company, or to do anything to prevent any person from bidding at said proposed sale, or to sell the lands therein described to the said Potlatch Lumber Company, in case there should be a higher bidder at such sale for the same." The foregoing statement is followed by the statement that the petitioner will rely on the record and files of the land board to show that the proposed sale was not in accordance with the requirements of the law.

It is further alleged by the petitioner that by reason of the possession of the lands by the Potlatch Lumber Company under their leases, and on account of the fact that the lands

are now heavily timbered and that none of the timber has been removed therefrom, the lands are not, and will not be at the date of the sale, "desirable for purchase by any other person or persons than the Potlatch Lumber Company; that said company's right of possession of said lands until the year 1922 makes it impossible for any other person than the said company, or its representatives, to become purchasers of said lands with any degree of benefit to themselves; that, therefore, all persons other than the company, or its representatives, will be precluded from offering bids at said pretended auction, and said lands will be sold to said company at the appraised value thereof."

The questions raised are: (1) Does the prohibition contained in sec. 8, art. 9 of the constitution against selling more than "twenty-five sections of school land" in any one year apply only to sections 16 and 36, granted for the use of the public common schools, or does it include all lands granted to the state by the general government for "educational purposes" of all kinds? (2) Are the lands involved in this case "timber lands" within the meaning of secs. 1580 and 1599, Rev. Codes, and was the notice of sale sufficient under the requirements of those sections? (3) Is the proposed sale contrary to the public policy of the state? (4) Can the state land board constitutionally sell state lands during the term of a lease of the same lands and during a period for which the right of occupation and possession is in a lessee or grantee of the state?

We will consider these questions in the order in which they are presented.

1. Article 9 of the constitution deals with the subject of "Education and School Lands." At the time of the adoption of the constitution there had been granted to the territory seventy-two sections of land for university purposes. By sec. 1946 of the Revised Statutes of the United States, Congress had also provided that secs. 16 and 36 in each township within the territories of New Mexico, Utah, Colorado, Dakota, Arizona, Idaho, Montana and Wyoming should be "reserved for the purpose of being applied to schools in the

several territories herein named and in the states and territories hereafter to be erected out of the same." So it will be seen that at the time of the constitutional convention the territory really had been granted no lands excepting the seventy-two sections for university purposes and sections 16 and 36 known as "school sections." While the convention evidently anticipated that Congress would make to the new state upon its admission grants of public lands similar to those previously made to other western states, still they had no positive assurance of anything other than the grants already made. We have examined the debates which took place in the convention at the time of the adoption of the several sections of art. 9, and we find that the chief discussion was directed to the subject of "school lands," and it is evident that the school lands meant and referred to throughout these debates were sections 16 and 36. Numerous propositions were submitted with reference to the powers of the state to sell or lease these lands. A large number of the members of the convention were absolutely opposed to ever selling these lands but favored holding them in perpetuity and leasing them for the benefit of the common schools. Others favored their speedy sale. The result of the debates on this subject was a compromise, embodied in sec. 8, whereby sales were limited to twenty-five sections each year and to subdivisions of not exceeding 160 acres to any one individual, company or corporation. Mr. McConnell, who was one of our first United States senators after the admission of the state, and who was also afterward governor of the state, debated this question at some length and proposed amendments, some of which were finally adopted and are now a part of sec. 8; art. 9. Judging from his discussion of the subject and the questions which were asked him, and the answers given, it appears very clearly that he and some, if not all, of his associates in the convention understood the words "school lands" as used in the proviso to section 8 to refer merely to sections 16 and 36. In speaking of the limitation of the amount to be sold annually, he insisted that it should only apply to sections 16 and 36, and said: "It

would not be the object of this convention to restrict the entire lands of this territory to twenty-five sections."

Again, in course of the debates on the amendment to sec. 8, art. 9, Governor McConnell said: "Now, this refers to school lands,—this entire section. We have other lands, and will have large quantities of school lands provided for educational purposes, and I think in this section we should not lose sight of them. There should be as well a similar limitation placed upon university lands, and there will be doubtless some lands donated to this state for agricultural purposes, and there is no provision as to their protection or how they shall be sold, no limitation as to condition or quantity or time at which they shall be sold, and I don't think we should lose sight of those."

In answer to a question propounded by Mr. Mayhew, if his amendment would refer to university lands or any other lands, Mr. McConnell said: "It limits it to school lands."

In considering the question as to whether the words "school lands" as embodied in the last sentence of sec. 8 refers only to sections 16 and 36 or to all lands granted to the state for educational purposes, it is well to briefly notice some of the preceding provisions of the same article. By sec. 1, of art. 9, the constitution guarantees a "system of public, free common schools." There can be no doubt but that the "public, free common schools" here mentioned means the free school system which has been generally adopted in this country, and has specific reference to the district schools throughout the state established for the training and instruction of the youth of the state in the primary and elementary branches of learning.

Passing to sec. 2 of the same article, it is provided that "the general supervision of the public schools of the state shall be vested in a board of education," etc. "The public schools" referred to in this section were evidently the same as were provided for in sec. 1, and meant the "public, free common schools." Sec. 3 provides that, "the public school fund of the state shall forever remain inviolate and intact," etc. The words "public school" as used in this section was

following up the provisions of secs. 1 and 2, and undoubtedly referred again to the "public, free common schools." The words "public school" are again used in sec. 4 in defining what should constitute "the public school fund of the state." When we come to examine sec. 5 of this article, we find explicit language employed showing clearly that the framers of the constitution in the use of the word "school" in that and the preceding sections had not intended to include institutions of higher learning than the free common schools. In this latter section, they were providing against the use of any of the public funds in aid of any church or sectarian or religious society, or for any religious purpose, "to help support or sustain any school, academy, seminary, college, university, or other literary or scientific institution," etc. It will be observed that the framers of the constitution had not anticipated that the word "school" included "academy, seminary, college, university and scientific institutions," and so they enumerated all these different grades of institutions and branches of learning which rank above the common schools. And it so happens that these institutions of learning ranking higher than the common school, and enumerated in sec. 5, are the specific institutions of learning to which Congress subsequently, upon the admission of the state, made sundry land grants "for educational purposes."

By sec. 6 the framers of the constitution became somewhat more general and there provided that "no religious test or qualification shall ever be required of any person as a condition of admission into any public educational institution of the state, either as a teacher or a student," etc. By the next sentence of the same section, it is provided that "no sectarian or religious tenets or doctrines shall ever be taught in the public schools, nor shall any distinction or classification of pupils be made on account of race or color." By this section they evidently intended to cover not only "the public schools" but also all "public educational institutions of the state."

It will be seen that the first five sections of this article are dealing with the "public, free common schools," while

section 6 not only deals with the "public schools," but also with all "public educational institutions of the state."

Section 7 takes up an entirely different subject. It provides for a state board of land commissioners, and designates the officers who shall constitute this board. This brings us to sec. 8, which reads as follows:

"It shall be the duty of the state board of land commissioners to provide for the location, protection, sale or rental of all the lands heretofore, or which may hereafter be, granted to the state by the general government, under such regulations as may be prescribed by law, and in such manner as will secure the maximum possible amount therefor: Provided, that no school lands shall be sold for less than ten (10) dollars per acre. No law shall ever be passed by the legislature granting any privileges to persons who may have settled upon any such public lands, subsequent to the survey thereof by the general government, by which the amount to be derived by the sale, or other disposition of such lands, shall be diminished, directly or indirectly. The legislature shall, at the earliest practicable period, provide by law that the general grants of land made by Congress to the state shall be judiciously located and carefully preserved and held in trust, subject to disposal at public auction for the use and benefit of the respective objects for which said grants of lands were made, and the legislature shall provide for the sale of said lands from time to time and for the sale of timber on all state lands and for the faithful application of the proceeds thereof in accordance with the terms of said grants: Provided, that not to exceed twenty-five sections of school lands shall be sold in any one year, and to be sold in subdivisions of not to exceed one hundred and sixty (160) acres to any one individual, company or corporation."

It will be observed that sec. 8 is general in its provisions, and has reference to "all the lands heretofore or which may hereafter be granted to the state by the general government." The power of location, protection, sale, and rental of these lands is vested in the state board of land commissioners. It will be noticed that the closing proviso of sec.

8 is "that not to exceed twenty-five sections of school lands shall be sold in any one year, and to be sold in subdivisions of not to exceed one hundred and sixty acres to any one individual, company or corporation." There is nothing contained in this section or the language employed which indicates that the framers intended to use the word "school" and the words "school lands" in any different sense here than that in which they had employed the same words in the preceding sections of the same article. If they employed the word "school" in this proviso in the same sense in which they had used it in sec. 5, it is at once clear that they did not intend to include within the meaning and purview of that word "academy, seminary, college, university, or other literary or scientific institutions." If used in the same sense in which it is employed in sec. 5, and, indeed, in all the preceding sections of the same article, they clearly intended to mean only the "public, free common schools." It would therefore follow that by the words "school lands" as here employed by the framers of the constitution, they meant sections 16 and 36 which had previously been granted to the territory for the use of the common schools.

This view is reinforced by the provisions of sec. 10 of the same article, wherein they were dealing specifically with the university, and it will be there noted that they did not consider that university lands were included within the term "school lands," and that while they intended to limit the number of acres of university lands that might be sold *to any one person, company or corporation,* they did not desire to limit the *number of acres that might be sold in any one year,* and so they left out the limitation as to the amount of land that might be sold in any one year, in writing section 10, but repeated the limitation as to the number of acres that might be sold to *any one person.*

Again reverting to sec. 3, it appears that what is designated as the "public school fund of the state" is required to be "distributed among the several counties and school districts of the state in such a manner as may be prescribed by law." Now, school districts are established only for the

public common schools, and when the words "school district" are used, they at once imply the free, common schools, and no one thinks of a college, university or normal school in connection with the term "school district." The word "school" as used in other constitutions and statutory enactments has been frequently defined by the courts, and it has almost uniformly been held to refer to the public, common schools generally established throughout the United States, and usually referred to as the "common schools" of the country. (See *Lichtentag v. Tax Collector*, 46 La. Ann. 572, 15 So. 176; *Commonwealth v. Conn. Valley St. Ry. Co.*, 196 Mass. 309, 82 N. E. 19; *In re Townsend*, 195 N. Y. 214, 88 N. E. 41, 22 L. R. A., N. S., 194; 16 Am. & Eng. Ann. Cas. 921; *Gordon v. Cornes*, 47 N. Y. 608, 616; *Merrick v. Inhabitants of Amherst*, 12 Allen (Mass.), 500; *Chegaray v. Mayor etc. of N. Y.*, 13 N. Y. 220.)

2. It appears that in this case the notices of sale provide for a payment to be made at the date of sale and the balance to be paid in sixteen equal annual instalments. It is contended by the plaintiff that the notice of sale was not in conformity with the statute, for the reason that under the provisions of sec. 1580, Rev. Codes, "timber lands and lands chiefly valuable for timber" must be sold for "cash on the day of sale," and that under this provision a notice of sale providing for sixteen annual instalments would be invalid, while under sec. 1599, Rev. Codes, it is provided that "timber and timber lands belonging to the state of Idaho may be sold by the state board of land commissioners, at their option, upon payment of instalments of the purchase price thereof as follows: Twenty per cent of the purchase price thereof must be paid at the time of purchase, and the balance of such price in from ten to twenty equal annual instalments, with annual interest thereon at the rate of six per cent per annum payable in advance; the number of instalments to be fixed by the state board of land commissioners at the time of purchase." It is insisted by the plaintiff that under this latter statute the notice would be invalid, and that consequently no legal notice was ever given. It is

contended, on the other hand, by counsel who appear as: *amici curiae,* that these lands are not "timber lands" within the meaning of either of the foregoing sections, for the reason that the timber has already been sold and disposed of,. and that the state has no further timber thereon, and that. the lands when stripped of the timber will be useful only,. if at all, for either grazing or agriculture. We cannot accept this line of reasoning. These lands are covered with: a heavy growth of saw timber, and while the timber has been· sold by the state, it still stands on the land, and the· state· has a reversionary right in the timber itself to the extent. of all that may remain standing at the expiration of twenty years from the date of the sale of the timber. Such timber·· as remains standing at the expiration of that date will be a part of the real estate and will pass by conveyance of the fee. This has been held so repeatedly and by courts. of such: high standing that we do not think it merits further· discussion or consideration. See the following authorities: *Strasson v. Montgomery,* 32 Wis. 52; *Pease v. Gibson,*. 6· Me.. 81; *Webber v. Proctor,* 89 Me. 404, 36 Atl. 631;· *Morgan v. Perkins,* 94 Ga. 353, 21 S. E. 574; *Lethonen v:. Marysville· Water & Power Co.,* 50 Wash. 359, 97 Pac. 292;· *Saltonstall· v. Little,* 90 Pa. 422, 35 Am. Rep. 683; *Ford Lumber & Mfg.. Co. v. Cress,* 132 Ky. 317, 116 S. W. 710.

There is no doubt in our minds but that the· lands proposed to be sold are timber lands within the meaning of both: sections 1580 and 1599, Rev. Codes. Counsel seem to be in·· doubt as to which of these sections is applicable: at the present time on the subject of sales for cash and· instalments. on timber lands. There is a direct conflict between the two· sections, and in that view of the case we hold that the latter· section, 1599, prevails. Sec. 1580 was adopted in 1905 (1905 Sess. Laws, 131); sec. 1599 was enacted· two years; later (1907 Sess. Laws, 193). It is true that both of these sections of the statute were again re-enacted and· adopted at the same time in the Revised Codes at the 1909 session of· the legislature. Notwithstanding that fact, we take notice· of times and conditions under which the two. statutes. were:·

originally adopted, and it thus appears clearly that sec. 1599 was intended to supplement and supplant the provisions of sec. 1580 with reference to authorizing the sale of timber and timber lands on payment of instalments instead of requiring all cash to be paid at the time of the sale. In fact, this view is clearly enunciated in sec. 1603, which is the last section of art. 2, title 9, in which sec. 1599 is to be found.

It is next contended by counsel, who appear as *amici curiae*, that the defect in the notice of sale cannot avoid or invalidate the sale so far as the state is concerned. In view of the fact that sec. 1599 authorizes the land board to sell such lands for twenty per cent cash and the balance in instalments of from ten to twenty years, as may be fixed by the board, we fail to see how the notice given in this case would avoid or invalidate the sale in the event bidders appear and submit bids and are willing to comply with the terms of the statute. The state could not suffer. It is probable that if the notice does not clearly state the terms on which the sale will be made, that a purchaser would not be bound by a bid, but that is a question which does not confront us in this case. It is true that notices should in all cases conform to the statute and the order of the board, but we cannot see how the defect in this case would afford grounds for restraining the sale.

3. It is next contended that the proposed sale is contrary to the public policy of the state. It is said by counsel for plaintiff in their brief that "On the grounds of public policy this sale should be held invalid unless it is such as is clearly authorized by the constitution and statutes of the state. The state lands have never been classified, and while it may be true that the lands involved in this sale are worthless for agricultural purposes and perhaps of small value for grazing purposes, they are useful for the purpose of protecting the watersheds of the state and conserving the water supply for the irrigation of the arid agricultural portions, and, further, as there is no classification of our state lands by legislation or otherwise, if the state board can dispose of several thousand acres of these lands, apparently worthless for agricul-

tural purposes, there is nothing to prevent the board, as a matter of law, disposing of many thousands of our agricultural lands to any corporation that wishes to buy, and to assist in the accomplishment of this purpose, the individual or corporations desiring to so purchase a large body might first lease the agricultural lands for five years, as the statute provides for that length of time, and then at once ask to have them sold and, by the advantage gained by the lease, crowd out competition and become the purchaser at the sale.'' As a matter of policy and business expediency this argument might appeal to the board, but it cannot be considered by the court. In the first place, the constitution vests the control, management and disposition of state lands in the state board of land commissioners. (Sec. 8, art. 9.) They are, as it were, the trustees or business managers for the state in handling these lands, and on matters of policy, expediency and the business interest of the state, they are the sole and exclusive judges so long as they do not run counter to the provisions of the constitution or statute. Counsel fail to call our attention to any established public policy in this state which runs counter to the course pursued by the board. Indeed, all of our statutes since statehood have authorized the sale and leasing of state lands, and it has been the uniform policy apparently of the various land boards from time to time to lease state lands and to sell timber from state lands and to sell the lands in fee, whether they be leased or not leased. The public policy of the state is gathered from its public history, the trend of its laws and the conduct and practice of its public officials, legislative, executive and judicial, in the administration, construction and execution thereof. (32 Cyc. 1251.) If these things are to be consulted, the transaction here proposed is more in consonance with the public policy of the state than in violation thereof. As to the wisdom of that policy or its advantages and benefits to the state, the courts have nothing to do as against express legislation on a given subject.

4. It is contended that under the terms of sec. 8, art. 9, which provides that it shall be the duty of the state board of

land commissioners to provide for the sale of the lands granted to the state by the general government "in such manner as will secure the maximum possible amount therefor," the state land board cannot constitutionally sell lands that are at the time under lease. It will be remembered that the timber standing on these lands was sold on the 10th day of November, 1902, and the purchaser was given the right of possession for the period of twenty years in which to remove the timber. Of this lease counsel for petitioner say in their brief: "This possessory right amounts in substance to a lease for a term of twenty years." We agree with counsel that this is in substance a lease until such time as the timber is removed from the land, but it may be debatable as to whether the right of possession would continue in the purchaser of the timber after the removal of the timber from the land, even though that be long before the expiration of the twenty-year period. But it is argued that after the land has been leased for a twenty-year period, the board cannot reasonably expect competitive bids which will result in bringing to the state "the maximum possible amount" for the lands thus sold. It may be true that the state cannot in some cases, or possibly in any case, realize the maximum possible amount for lands which have been leased for a long term of years, or at least such an amount as it could realize if the lands were not so leased and the purchaser could obtain immediate possession. It is self-evident, however, that the lands can be sold at public auction for the "maximum possible amount" which such lands will bring at that time and under conditions then existing. Of course, they have to be sold under the conditions existing at the time of the sale. It may be considered by some as questionable or doubtful business policy to lease lands for a long period of time, and then undertake to sell the lands a great number of years prior to the expiration of the lease, but however doubtful or questionable the business policy or expediency of so doing may be, it does not affect the power and authority of the board to sell. Both the constitution and statute authorize the board to lease and sell state lands, but nowhere does either the constitution or statute

prohibit the sale of the fee of lands under lease, and there being no prohibition in either the constitution or statute, and the power of rental, sale and disposition of state lands being vested in the state board of land commissioners, the courts are without the authority to prohibit a sale, although the land may be at the time leased for a long period of years. This is purely a matter of policy to be determined by the state board of land commissioners, and if they act unwisely, they must account to the electors of the state, but their judgment and discretion in such matters cannot be controlled by the courts. It is contended, however, by counsel for the plaintiff that "an auction is a sale by consecutive bidding intended to reach the highest price of the article by exciting competition for it" (1 Words and Phrases, pp. 553, 637), and that there cannot be any such thing as a "public auction" of lands proposed to be sold under the conditions of these lands. This argument seems to us without merit. Property may be sold at public auction to the highest bidder and for the "maximum possible amount," although a like public auction under other conditions and at other times might bring many times more and consequently a much larger "maximum possible amount." The question as to the most advantageous time to sell timber or lands or lease lands is always one of uncertainty and requires good business judgment to determine it wisely and for the best interest of the state, and however exercised may prove unwise and a positive loss to the state as viewed in the light of subsequent events. These conditions, however, do not change a sale from the character of a public auction to the condition of a private sale or signify that the amount received was not the maximum possible amount that might be received under the conditions existing at the time the sale was made.

Some reference has been made to the resolution which the board passed requiring certain concessions of the Potlatch Lumber Company in the event it should be the highest bidder, and also to the terms of the agreement the board required the agent of the company to enter into before it would order the property sold. This resolution would appear to be clearly

in the interest of the state, and it was eminently proper for the board to require the company to enter into a contract agreeing to pay the appraised value of the land before it went to the trouble and expense of advertising the land for sale. This is a similar practice to that adopted by the Department of the Interior in selling fractional subdivisions of the public domain. An applicant to purchase is required to enter into an agreement to bid as much as the minimum price before the government will advertise the land for sale. That is just what has been done in this case by the state land board. In the event the Potlatch Lumber Company is the highest bidder, it will, in addition to the price it is required to pay for this land, be obliged to make the concessions and relinquishments specified in the resolution of the board and the agreement filed by the company's agent. The company, in order to secure these lands, must not only be the highest bidder, but must also give the additional value of these concessions in order to get the land. These conditions and concessions will tend to increase the price per acre bid by the company for this land instead of decrease it. At any rate, the state land board must have considered that these relinquishments of the company's right of possession of lands that have been cut over are worth something to the state. The transaction was given the widest publicity, and the terms of both the resolution and agreement were made public, and there was no secrecy about the proposed sale so far as has been made to appear in this case.

It has also been argued that no one else can bid against the lumber company for so large a tract of land, and that no one will bid against the company where it is in possession of the land and has a right of possession for something like eleven years yet and has its timber standing on the land. This may or may not be true. We are not prepared to say. It may be that no one else would bid against the company or that no one would feel justified in doing so. It may be, on the other hand, that the company would pay a larger price for this land in order to own the fee and avoid the necessity of removing the timber within the next eleven years than any-

one else would pay for the land if the timber was removed. As to what would be the result under these circumstances, we have no way of knowing, and it is a matter of no consequence to the court in determining the legal questions presented in this case. These are again matters of policy and business wisdom which should appeal to the judgment of the land board, and are not questions of law to be determined by the court.

We find nothing in the action of the board that is repugnant to the constitution or statute of the state. The alternative writ will be quashed and the proceeding is dismissed, with costs in favor of the board.

Sullivan, J., concurs.

Stewart, C. J., concurs in conclusion reached.