# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 37528

| | | |
|---|---|---|
| IN THE MATTER OF THE VERIFIED PETITION FOR ISSUANCE OF A WRIT OF PROHIBITION. | ) ) ) | |
| -------------------------------------------------------- | ) | Boise, June 2010 Term |
| HON. LAWRENCE G. WASDEN, the Attorney General of Idaho, ex rel. the STATE OF IDAHO, | ) ) ) | 2010 Opinion No. 128 |
| | ) | Filed: December 1, 2010 |
| Petitioner, | ) ) | Stephen Kenyon, Clerk |
| v. | ) ) | |
| IDAHO STATE BOARD OF LAND COMMISSIONERS, and GEORGE BACON, in his official capacity as Director of the Idaho Department of Lands, | ) ) ) ) | |
| | ) | |
| Respondents. | ) | |

Petition for Issuance of Writ of Prohibition filed by Hon. Lawrence G. Wasden, Attorney General.

The motion to dismiss is <u>granted</u>.

Hon. Lawrence G. Wasden, Attorney General, Boise, for petitioner. Melissa N. Moody argued.

Hawley, Troxell, Ennis & Hawley, Boise, for respondents. Merlyn W. Clark argued.

_____

HORTON, Justice

This matter comes before this Court on a petition for issuance of a writ of prohibition, filed by Attorney General Lawrence Wasden. Wasden seeks a writ of prohibition to stop the Director of the Idaho Department of Lands (IDL) George Bacon from executing new lease agreements on recreational home sites located on Priest Lake and Payette Lake (cottage sites). Wasden argues that the proposed lease agreements (cottage leases) for the cottage sites violate both the Idaho Constitution and I.C. § 58-310A by: (1) failing to secure the maximum long-term

1

financial return for the beneficiaries of the Idaho public lands trust; and (2) failing to generate market rent. Respondents have moved to dismiss the petition, arguing that the decision of the Idaho State Board of Land Commissioners (the Land Board) regarding rental rates was not in excess of its discretion and that issuance of a writ of prohibition is inappropriate due to the availability of other remedies. Because we find that there is a plain, speedy and adequate remedy in the ordinary course of law, we do not reach the question of whether the State Board of Land Commissioners (the Board) is attempting to act in excess of its jurisdiction, and dismiss the petition for writ of prohibition.

## I. CONSTITUTIONAL AND STATUTORY BACKGROUND

The federal government granted federal lands to the Idaho Territory, later the State of Idaho, through § 4 of the Idaho Admission Bill of 1890, for the purpose of supporting public education. Article IX, section 7 of the Idaho Constitution established the State Board of Land Commissioners, comprised of the governor, superintendent of public instruction, secretary of state, attorney general and state controller. The Board is given "the discretion, control and disposition of the public lands of the state, under such regulations as may be prescribed by law." *Id*. Article IX, section 8 of the Idaho Constitution states, *inter alia*:

> It shall be the duty of the state board of land commissioners to provide for the location, protection, sale or rental of all the lands heretofore, or which may hereafter be granted to or acquired by the state by or from the general government, under such regulations as may be prescribed by law, and in such manner as will secure the maximum long-term financial return to the institution to which granted or to the state if not specifically granted . . . .

Idaho Code § 58-304 governs the leasing of state lands, and provides, *inter alia*, "[t]he state board of land commissioners may lease any portion of the state land at a rental amount fixed and determined by the board." Idaho Code § 58-310(1) states:

> When two (2) or more persons apply to lease the same land, the director of the department of lands, or his agent, shall, at a stated time, and at such place as he may designate, auction off and lease the land to the applicant who will pay the highest premium bid therefore, the annual rental to be established by the state board of land commissioners.

However, the cottage sites were specifically exempted from the conflict auction requirement by I.C. § 58-310A, wherein the legislature determined that the stability gained by continuing to lease the cottage sites to existing long-term lessees was the best means of achieving the maximum long-term financial return to the beneficiaries. Specifically, I.C. § 58-310A provides

2

that "[i]n the absence of the conflict application and auction procedure in the single family, recreational cottage site and homesite lease, and lease renewal process, the board shall insure that each leased lot generates market rent throughout the duration of the lease."

Idaho Code § 58-101 established the IDL as the executive agency charged with assisting the Board in carrying out its constitutional duty of administering state endowment lands. IDL's powers and responsibilities are set forth in I.C. § 58-119. George Bacon is the Director of IDL (Director). The Director of IDL is tasked with countersigning leases issued by the president of the Board for rental of state endowment lands, pursuant to I.C. § 58-121.

Section 20.03.13 of the Idaho Administrative Procedure Act (IDAPA) provides the specific structure that is employed in the leasing of the state endowment lands. IDAPA 20.03.13.027 is titled "equity sharing premium rental" and states that:

> Equity sharing premium rental shall be required through December 31, 1992 or until contract rents have been increased to full market rents, whichever comes first, and is due and payable prior to lease assignment and/or transfer and shall be computed as follows: Assignment Payment. All assignments and/or transfers shall pay a rate of ten percent (10%) of the leasehold value as determined under Section 025.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Each cottage site is owned in fee simple by the State of Idaho, and held in trust for the benefit of the public schools, normal schools (Idaho State University, Department of Education, and Lewis-Clark State College), and the state hospital (collectively "the Beneficiaries"). The Board began renting cottage sites in Idaho in 1924, but the majority of lots were not leased until sometime between the mid 1940's and early 1950's. The State originally leased the cottage sites as bare land, and the cottage site lessees (Lessees) themselves constructed homes and other structures and improvements upon the land for their own use and benefit. From 1945 to 1988 cottage sites were leased for flat rates, with sporadic adjustments (generally rates were adjusted every three-to-five years, with an extreme of fourteen years between adjustments).

The Board has long allowed the Lessees to sell or assign their leasehold interests to others for profit. IDAPA 20.03.13.10.06, defines "Leasehold Value" as "[t]he value which accrues to a leasehold estate when the contract rent is below the market rent." This proposition has also been recognized by IDL and its former and current directors, former and current members of the Board, and professional appraisers. Leasehold values are determined by

3

subtracting the value of improvements and personal property from the total sales price. IDAPA 20.03.13.25.

As leasehold values grew it became clear to the Board that it was not achieving market rent, and in 1981 the Board invented the concept of "premium rent" to try to decrease the amount of profit the Lessees were reaping from the gap between actual and market rent. The term "premium rent" is a misnomer; it would be more accurate to refer to this mechanism as a "leasehold transfer fee." Premium rent requires that the lessee pay the State a certain percentage of the value that the lessee receives from selling his leasehold interest in a cottage site.[1] In 1981 this percentage was set at 10%. So, for example, if a lessee sold his leasehold for $160,000 and had placed $60,000 of improvements and personal property on the land, the leasehold value would be $100,000. Of that $100,000 the State would be entitled to $10,000 and the remaining $90,000 would go to the selling lessee. Premium rent was conceived of as a temporary measure, the utility and impact of which would disappear as rents reached fair market value. In fact the IDAPA provision establishing premium rent – IDAPA 20.03.13.027 – reproduced above, expired on December 31, 1992. Nevertheless the Board and IDL have continued to apply premium rent to leasehold sales.[2]

In 1986, a study by IDL showed that the State was receiving a rate of return on the cottage sites of approximately .67% per year. In an attempt to increase the return for the Beneficiaries the Board abandoned the flat rental rates and instead adopted a rental rate target at 2.5% of each cottage site's appraised value, to be phased in (incrementally increased) over a ten-year period.

From 1905 until 1991 the cottage sites were subject to conflict auctions pursuant to I.C. § 58-310, and its statutory predecessors. Idaho Code § 58-310 provides that, when a lease term expires and more than one party makes application to lease the property, an auction is held amongst the applying parties to determine which is willing to pay the most to lease the property. Despite having been subject to this provision, no conflict auction had been carried out on a cottage site until 1990. It is likely that this apparent lack of interest was attributable to lack of public awareness, largely due to the fact that the Board had a policy against advertising when

---

[1] Premium rent is only collected when a lessee transfers his leasehold for profit - in excess of the money he expended in developing the property. Where a lessee assigns his leasehold interest to another for no money there is no premium rent, as there is no basis upon which to determine leasehold value.

[2] A report prepared by a subcommittee that was appointed by the Board, shows that from 2003 until approximately 2010, leasehold transfers brought in over $25,000,000 for lessees, but only $2,700,000 for the Beneficiaries.

cottage leases were expiring, and posted notices of availability only on the local court house bulletin board. In 1990 the Board received conflicting applications for two different cottage sites, where both the existing lessees and an outside party applied to lease. Instead of holding a conflict auction as I.C. § 58-310 required, IDL requested that the legislature draft legislation exempting cottage sites from I.C. § 58-310. As a result, I.C. § 58-310A was passed, eliminating conflict auctions as a means of establishing the maximum long-term financial return and instead requiring that the Board ensure that the cottage leases generate market rent throughout their duration.

Following the passage of I.C. § 58-310A in 1991, the Board reexamined the rental rates charged for cottage sites in order to comply with the statutory mandate of obtaining market rent. In order to ascertain market rent, the Board employed a consulting group to perform appraisals on 13 cottage sites at Payette Lake and 16 cottage sites at Priest Lake. After conducting these appraisals the consulting group recommended variable rental rates, from 4.5% of market value for some cottage sites, up to 5.5% for others. A subcommittee appointed by the Board considered the consultant recommendations, but nevertheless recommended that the Board continue the already implemented 2.5% rental rate, with a target rent based on the 1992 appraisal, phased in over 10 years. One Board member expressed his discomfort with ignoring the consultant's recommendations, warned that not setting a new target rate for 10 years would place the cottage leases even further below market rent than they already were, and stated that the phase-in schedule for rent must be abandoned in order to "generate market rent throughout" the lease term, as required by I.C. § 58-310A. IDL also advised the Board against freezing the target rental rate at the 1992 appraised values. The Board nevertheless voted to implement the subcommittee's recommendations.[3]

By 1997, leasehold values had escalated sharply[4] and for some cottage sites the local property taxes actually exceeded the rent IDL was collecting from the Lessees. The escalating property value, coupled with the 5.3% cap on rent increases from year-to-year, meant that the return on the cottage sites was only slightly higher than it had been in 1986, at 1%. IDL

---

[3] In fact, far from removing the phase-in schedule, the Board further restricted the rate at which rent could increase from year to year. The Board had previously capped rent increases at 25% over the previous year's rent, but elected to lower that cap to 5.3%.

[4] In 1994 leaseholds for lakefront cottage sites at Payette Lake were averaging nearly $285,000, non-lakefront cottage sites at Payette Lake were averaging $59,000, and lakefront sites at Priest Lake were averaging slightly over $96,000.

concluded that it was quite apparent that the rent being collected under the cottage leases was below market rent. IDL concluded that all available market data suggested that market rent would be somewhere between 3% and 5%, noting that most data supported a 5% rate.[5] IDL concluded that the Board would not be complying with its constitutional duty if it continued with its existing rental formula. The Board nonetheless voted to continue the 2.5% rate, though it did create a new target rent based on the most recent property assessment — to be updated on an annual basis — eliminated the phase-in period, and removed the yearly cap on rent increases.[6]

Following its 1997 vote, the Board commissioned appraisals of the cottage sites on each lake, asking the appraisers to determine market rent. The appraisers recommended a rental rate of 3.5% at Priest Lake and between 4% and 6% at Payette Lake. In 1998 a subcommittee of the Board met to consider the recommendations of the appraisers and IDL. After recognizing the strong support in market data for rates of 3.5% at Priest Lake and 4% at Payette Lake, the subcommittee nevertheless recommended that the Board maintain the 2.5% rate, as it "recognizes and takes into consideration the lessees' sweat equity and site improvements." Rental rates have ostensibly remained at 2.5% since 1998.

Due to escalating property values around the cottage sites at Payette Lake, the 2.5% rate called for increases in rental rates of between 48% and 87% from 2007 to 2008. In response to these large pending increases the Board voted to freeze Payette Lake cottage site rental rates at the 2007 level. The rental rate formula called for an increase in rent for both the Payette Lake and Priest Lake cottage sites from 2008 to 2009, but the Board voted to freeze rents at the 2008 level (which was really the 2007 level for the Payette Lake cottage sites, due to the freeze the year before). For 2010 the Board again froze rent, leaving the 2007 rate in effect at Payette Lake and the 2008 rate in effect at Priest Lake.

On June 12, 2007, the Board appointed Secretary of State Ysursa and Superintendent of Public Education Luna to a subcommittee (the Cottage Site Subcommittee) tasked with making recommendations to the Board on market rate for the cottage sites. The goal of the Cottage Site Subcommittee was to recommend an updated rental formula to be included in cottage leases for the ten-year lease term to begin on January 1, 2011.

---

[5] IDL noted that the current 2.5% rate "is supported only through an earlier appraisal which reveals that Newport Beach City, California has an actual rate of return of 1.8% to 2.5%.

[6] The Board also implemented a "hardship provision" under which "any lessee forced to sell due to escalating rental could ask for deferment of any increase in rental for a period of up to three years. Payment of deferred rent would be due upon sale of the leasehold or at the expiration of the deferment."

The Cottage Site Subcommittee recommended a new lease structure with annual rent set at 4% of the average market value of each cottage site over the previous 10 years, to be updated annually (the so-called "rolling average"). However, the 4% rolling average would not be reached until the end of a 5-year phase-in period during which rent would be incrementally increased from its current level to the target rent. The new cottage leases would also include premium rent, though under a more complicated formula than that previously employed. The Cottage Site Subcommittee recommended that "premium rent be calculated at 10% of the gross leasehold value or 50% of the net leasehold value, whichever is the greater amount for the endowment." The Cottage Site Subcommittee explained that "[n]et leasehold value shall be calculated by subtracting the original leasehold value (sales price less the value of tenant improvements) of the lessee who is transferring the lease from the leasehold value (sale price less the value of tenant improvements) when a transfer occurs." It was clarified during a regular Board meeting that the Cottage Site Subcommittee was recommending the 50% net leasehold premium rent be phased in over a period of 5 years.

The Director of IDL analyzed the Cottage Site Subcommittee recommendations and determined that the rolling average system of determining rental rates would result in actual return being approximately 2.4% assuming land value appreciates at 4.8% a year, or 1.5% if land appreciates at 10.3% annually. The Director concluded "I do not believe the Subcommittee's recommendation ensures that each leased lot generates market rent throughout the duration of the lease, but neither does the current system." On March 16, 2010, the Board voted 3-2 for the new lease structure as recommended by the Cottage Site Subcommittee.

On March 24, 2010, Attorney General Wasden submitted a Verified Petition for Issuance of a Writ of Prohibition with this Court. Wasden alleges that the Board, of which he is a member, is acting in excess of its jurisdiction under the Idaho Constitution and statutory law in attempting to lease state endowment lands for less than market rent.

On April 8, 2010, the Board submitted a Motion to Dismiss with this Court, pursuant to Idaho Rule of Civil Procedure 12(b)(6). The Board argues that Wasden has failed to state a claim upon which relief may granted. In the Board's Memorandum in Support of Motion to Dismiss, filed the same day as the Motion to Dismiss, it argues that Wasden failed to demonstrate either of the two requisites that must be established in order for this Court to issue a writ of prohibition.

This Court heard oral argument on June 9, 2010.

## III. STANDARD OF REVIEW

In *Henry v. Ysursa*, we explained:

> This Court has original jurisdiction to issue writs of prohibition. Idaho Const. Art. V, §9. "The writ of prohibition is not a remedy in the ordinary course of law, but is an extraordinary remedy." *Maxwell v. Terrell*, 37 Idaho 767, 774, 220 P. 411, 413 (1923). Before this Court will issue such writ, two contingencies must be shown: "the tribunal, corporation, board or person is proceeding without or in excess of the jurisdiction of such tribunal, corporation, board, or person, and that there is not a plain, speedy, and adequate remedy in the ordinary course of law." *Olden v. Paxton*, 27 Idaho 597, 600, 150 P. 40, 41 (1915). The word "jurisdiction" when used in reference to a writ of prohibition includes the power or authority conferred by law. *Crooks v. Maynard*, 112 Idaho 312, 319, 732 P.2d 281, 288 (1987) (where administrative orders were within the "power and authority" of the administrative district judge, a writ of prohibition would not issue); *Stein v. Morrison*, 9 Idaho 426, 455, 75 P. 246, 256 (1904) (quoting from *Maurer v. Mitchell*, 53 Cal. 289, 292 (1878)) ("The word 'jurisdiction,' when used in connection with 'prohibition,' would be at once understood as being employed in the sense of the legal power or review. *State v. District Court*, 143 Idaho 695, 699, 152 P.3d 556, 570 (2007).

148 Idaho 913, __, 231 P.3d 1010, 1012 (2008). The party seeking the writ of prohibition carries the burden of proving the absence of that adequate, plain, or speedy remedy. *See Edwards v. Indus. Comm'n*, 130 Idaho 457, 460, 943 P.2d 47, 50 (1997) (applying the identical "plain, speedy, and adequate" requirement for writs of mandate).

## IV. ANALYSIS

As noted above, "[w]rits of prohibition are extraordinary and are issued with caution." *Gibbons v. Cenarrusa*, 140 Idaho 316, 318, 92 P.3d 1063, 1065 (2002). Without reaching the question of whether the Land Board has proceeded in excess of its jurisdiction, we find that there is "a plain, speedy, and adequate remedy in the ordinary course of law" as required by I.C. § 7-402, a remedy that is available by means of joining an action for declaratory judgment with a request for injunctive relief.

The use of the word "plain" in the statute has a readily apparent meaning. The remedy must be evident, obvious, simple or not complicated. For lawyers desirous of having another party act or refrain from acting in a specified manner, a request for injunctive relief is the obvious course of action. This Court has long recognized that a party may join an action for declaratory judgment with a prayer for injunctive relief. Indeed, during the seventy year history of cases in which this Court has considered appeals involving such joined claims, starting with

8

*Century Distilling Co. v. Defenbach*, 61 Idaho 192, 99 P.2d 56 (1940) and ending most recently in *Lattin v. Adams Cnty.*, 149 Idaho 497, 236 P.3d 1257 (2010), this Court has never questioned the propriety of joining such actions.[7]

Thus, the only remaining question is whether injunctive relief is a sufficiently "speedy" remedy. We are convinced that the availability of preliminary injunctive relief is sufficiently "speedy" as to warrant denial of the requested writ of prohibition.

The plaintiff in such an action[8] would be entitled to a preliminary injunction upon a showing that it appears that there is entitlement to relief and such relief would consist of "restraining the commission or continuance of the acts complained of. . . ." I.R.C.P. 65(e)(1). While injunctions are equitable in nature, they are within the scope of the "adequate remed[ies] in the ordinary course of law" contemplated by I.C. § 7-402. *See Butters v. Hauser*, 131 Idaho 498, 501, 960 P.2d 181, 184 (1998) ("The existence of an adequate remedy in the course of legal procedure, either legal or equitable in nature, will prevent the issuance of a writ of mandamus."). A preliminary injunction would prevent the threatened harm which underlies the presently requested writ of prohibition. Assuming that the plaintiff is successful in persuading the district court of the merits of its position, it would be entitled to a declaration that the Land Board's actions did not comply with I.C. § 58-310A or Article IX, section 8 of the Idaho Constitution. Permanent injunctive relief would then be appropriate.

In short, we agree with the reasoning of the Idaho Court of Appeals' decision in *Agricultural Services, Inc. v. City of Gooding*, 120 Idaho 627, 818 P.2d 331 (Ct. App. 1991) ("*ASI*"). In *ASI*, the court observed that, as of 1991, the decisions of this Court which recognized the writ of prohibition as a "proper and appropriate remedy for violations of statute by a public body or official" predated the adoption of the declaratory judgment act. *Id.* at 629, 818 P.2d at 333. While this Court has not shown much hesitance to issue writs of prohibition in the years

---

[7] The dissent writes that "a stay or injunction would only perpetuate [any violation by the land board], not remedy it in an adequate manner . . . ." We note that a writ of prohibition is not inherently superior to injunctive relief as a remedy. A court's order enjoining behavior is enforceable in precisely the same manner as that of a writ of prohibition. Enforcement of either can only come through exercise of the court's contempt powers.

[8] The dissent's argument that declaratory or injunctive relief will not be available to Wasden is effectively a suggestion that he lacks standing. There has been no suggestion by the parties to this action that Wasden lacks standing to seek a writ of prohibition and, without the benefit of briefing from the parties, we can discern no evident basis to conclude that Wasden has standing to obtain the requested writ of prohibition while similarly lacking standing before the district court. Without deciding the question whether Wasden would have standing to seek declaratory or injunctive relief, it is evident that the beneficiaries would have standing. *Selkirk-Priest Basin Ass'n, Inc. v. State ex re. Andrus*, 127 Idaho 239, 242, 899 P.2d 949, 952 (1995).

since *ASI* was decided, those decisions have conspicuously failed to closely examine the question of a "plain, speedy, and adequate" alternative. Without discussing each of these cases, we simply observe that this Court never addressed this requirement in view of the availability of declaratory and injunctive relief.

> It is a principle of universal application, and one which lies at the very foundation of the law of prohibition, that the jurisdiction is strictly confined to cases where no other remedy exists; and it is always a sufficient reason for withholding the writ, that the party aggrieved has another and complete remedy at law.

*Taylor v. Girard*, 54 Idaho 787, 792, 36 P.2d 773 (1934) (quoting *Kabadian v. Doak*, 65 F.2d 202 (Ct. App. D.C. 1933)). The avenues of preliminary and declaratory injunctive relief fit this description.

In so holding, we note that injunctive relief will be at least as effective as the issuance of the writ and, arguably, will be more effective. The Court's issuance of the writ of prohibition would not, itself, determine what appropriate market rates are. Rather, a grant of the writ would merely conclude that the new leases do not comply with the requirements of I.C. § 58-310A. Any decision of what the proper rental rates are or should be would be left to future action of the Land Board.

"[P]rohibition arrests proceedings which are without or in excess of the jurisdiction" possessed by the court or body in question, *Stein v. Morrison*, 9 Idaho 426, 455, 75 P. 246, 256 (1904), and serves to preserve the status quo wherein the court or body is acting within its jurisdiction. The Attorney General's position is based upon the premise that the Land Board has *never* complied with the requirements of I.C. § 58-310A. Thus, there is no status quo wherein the Land Board has acted within its jurisdiction to be preserved. We have always said that the writ of prohibition is "granted only when the court is satisfied that the remedy is appropriate." *Clark v. Ada Cnty. Bd. of Comm'rs*, 98 Idaho 749, 752, 572 P.2d 501, 504 (1977); see also *Pfirman v. Probate Court of Shoshone Cnty.*, 57 Idaho 304, 309, 64 P.2d 849, 850 (1937) ("Being an extraordinary writ, it should not issue in doubtful cases . . . .") (quoting *Rust v. Stewart*, 7 Idaho, 558, 561, 64 P. 222, 223 (1901).

This Court has also stated that the writ will not issue when its "effectiveness is doubtful." *Clark*, 98 Idaho at 752, 572 P.2d at 504. The legal issues presented by the Attorney General's claims involve the scope of the Land Board's discretion to determine "market rent" as required by I.C. § 58-310A. The determination of "market rent" is fundamentally a factual determination

although the statements of three-fifths of the membership of the Land Board do indicate that the leases in question do not achieve the level of market rent. Were we to issue the writ under these circumstances, it would certainly serve to warn the members of the Land Board to exercise caution in stating their views as to whether future lease terms comply with the requirements of I.C. § 58-310A, but it would not otherwise serve to prohibit future conduct in violation of the Land Board's statutory or constitutional duties. In *Clark*, this Court stated that a writ of prohibition will not issue unless "the writ will effectively prevent the respondent" from acting without or in excess of its jurisdiction. *Id.* If the writ will not have this effect, it will not be issued as it would merely be an idle gesture. *Id.* Instead, in an action for declaratory and injunctive relief, the district court will be in the best possible position to assess the fundamental factual question of whether the Land Board has violated its duties as trustee under Article IX, section 8, its statutory duties under I.C. § 58-310A, some combination thereof, or whether it has acted within its discretion.

As there is a plain, speedy, and adequate remedy available and because issuing the requested writ will not be any more effective in addressing the underlying questions, we grant the Land Board's motion to dismiss.

## V. CONCLUSION

We grant the Land Board's motion to dismiss, finding that there is a plain, speedy, and adequate remedy in the ordinary course of law such that the extraordinary remedy of a writ of prohibition would be improper.

Chief Justice EISMANN and Justice Pro Tem TROUT **CONCUR**.

BURDICK, J. dissenting:

The facts in this case are not in dispute. The record clearly demonstrates that the Land Board is exceeding its discretion in leasing the cottage sites for less than market value and failing to obtain the maximum long-term financial return for the beneficiaries, which is a violation of both I.C. § 58-310A and the Idaho Constitution. The majority does not deny this, instead finding that the Attorney General has other plain, speedy and adequate remedies available.

**A. There is no other plain, speedy and adequate remedy available in the ordinary course of law.**

It should be noted that the requirement that no other "plain, speedy and adequate" remedy exist in the ordinary course of law is phrased in the conjunctive. *See Henry v. Ysursa*, 148 Idaho

11

913, __, 231 P.3d 1010, 1012 (2008). That is to say, this prong is satisfied when there is no remedy in the course of law which satisfies all three criteria, being plain, speedy *and* adequate. To the extent the proposed cottage lease structure violates the Board's constitutional and/or statutory mandates, a stay or injunction would only perpetuate that violation, not remedy it in an adequate manner, let alone a speedy one.

I wish to initially note the rather cavalier manner in which the majority assumes that: (1) a preliminary injunction may be obtained in this case; or (2) that the Attorney General may obtain a declaratory judgment.

Idaho Rule of Civil Procedure 65(e) allows for the granting of a preliminary injunction in the following cases:

> (1) When it appears by the complaint that the plaintiff is entitled to the relief demanded, and such relief, or any part thereof, consists in restraining the commission or continuance of the acts complained of, either for a limited period or perpetually.
>
> (2) When it appears by the complaint or affidavit that the commission or continuance of some act during the litigation will produce waste, or great or irreparable injury to the plaintiff.
>
> (3) When it appears during the litigation that the defendant is doing, or threatens, or is about to do, or is procuring or suffering to be done, some act in violation of the plaintiff's rights, respecting the subject of the action, and tending to render the judgment ineffectual.
>
> (4) When it appears, by affidavit, that the defendant during the pendency of the action, threatens, or is about to remove, or to dispose of the defendant's property with intent to defraud the plaintiff, an injunction order may be granted to restrain the removal or disposition.
>
> (5) A preliminary injunction may also be granted on the motion of the defendant upon filing a counterclaim, praying for affirmative relief upon any of the grounds mentioned above in this section, subject to the same rules and provisions provided for the issuance of injunctions on behalf of the plaintiff.
>
> (6) The district courts, in addition to the powers already possessed, shall have power to issue writs of injunction for affirmative relief having the force and effect of a writ of restitution, restoring any person or persons to the possession of any real property from the actual possession of which the person or persons may be ousted by force, or violence, or fraud, or stealth, or any combination thereof, or from which the person or persons are kept out of possession by threats whenever such possession was taken from them by entry of the adverse party on Sunday or a legal holiday, or in the nighttime, or while the party in possession was temporarily absent therefrom. The granting of such writ shall extend only to the right of possession under the facts of the case, in respect to the manner in which the possession was obtained, leaving the parties to their legal rights on all other questions the same as though no such writ had issued: provided, that no such writ

shall issue except upon notice in writing to the adverse party of at least five (5) days of the time and place of making application therefore.

Here, a preliminary injunction may not be entered under I.R.C.P. 65(e)(2), as it is obvious that there is no injury to Attorney General Wasden in this case. An injunction is also unavailable under I.R.C.P. 65(e)(3) as there has been no allegation that the Board's actions violated Wasden's rights. Likewise, I.R.C.P. 65(e)(4) & (6) are clearly unavailable as no property has been removed or taken from any party. Finally, I.R.C.P. 65(e)(5) pertains to counterclaims and is clearly inapplicable here. Therefore, the only possible basis upon which Wasden could obtain a preliminary injunction is I.R.C.P. 65(e)(1), and it is far from certain that Wasden would be entitled to relief under that section.

In the event that a preliminary injunction is not entered, the unconstitutional actions of the Land Board will continue until a declaratory judgment finally works its way through the court system, much like the school funding case, which took fifteen years. *See State v. Dist. Court*, 143 Idaho 695, 152 P.3d 566 (2007). Speediness aside, it is unclear that the Attorney General even has standing to obtain a declaratory judgment.

Idaho Code § 10-1202 states:

> Any person interested under a deed, will, written contract or other writings constituting a contract or any oral contract, or whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or under legal relations thereunder.

It is obvious that the Attorney General is not a person interested under a deed, will, written contract or other writing constituting a contract, or an oral contract, so the first basis for relief under the declaratory judgment act is unavailable. It is likewise clear that the Attorney General's "rights, status or other legal relations" are not being affected, therefore the second basis for relief is unavailable. *See also Sunshine Mining Co. v. Carver*, 34 F.Supp. 274 (D. Idaho 1940); *Selkirk-Priest Basin Ass'n v. State ex rel. Andrus*, 127 Idaho 239, 899 P.2d 949 (1995).

Presuming that the Attorney General had standing to initiate a declaratory judgment action, the first thing that would occur in this "speedy" remedy proceeding is that all of the parties who filed intervening briefing in this matter would request to join as parties to the action. This could potentially include each and every lessee of the cottage sites. Each lessee would have

to be given a chance to present their side of the case, and voluminous discovery would undoubtedly result.

The majority cites to the Court of Appeals decision in *Agricultural Services, Inc. v. City of Gooding*, 120 Idaho 627, 818 P.2d 331 (Ct. App. 1991), in attempting to eliminate this Court's constitutionally provided power to issue writs of prohibition. The legislature, in enacting the Declaratory Judgment Act, did not intend to replace the writ of prohibition as an avenue of relief, but following the logic of the majority here that is essentially what would result.

**B. The Board is acting in excess of its jurisdiction in attempting to implement leases that will not achieve market rent, in contravention of I.C. § 58-310A, as applied by the Idaho Constitution**.

Wasden argues that by adopting the cottage site lease terms at issue the Board is acting in excess of its jurisdiction under both Article IX, section 8, of the Idaho Constitution and I.C. § 58-310A. The Board responds that it is granted broad discretion under the Idaho Constitution to manage the endowment property in a manner designed to achieve maximum long-term financial returns to the Beneficiaries.

This Court addressed the issue of jurisdiction, as it applies to the scope of the Board's action—in the context of a petition for a writ of prohibition—in the case of *Balderston v. Brady*. 17 Idaho 567, 107 P. 493 (1910). In *Balderston*, the Board was attempting to give some of the endowment lands away to private citizens (settlers) for free. *Id*. In discussing whether the Board was acting outside of its jurisdiction, the *Balderston* Court wrote:

> In many of the matters coming before the board in reference to state lands they must exercise their judgment and discretion, and it is a well-settled principle of law that in such cases the courts will not attempt to control or supervise the discretion vested in the officers of a co-ordinate branch of the government. . . . The finding of the board on the facts of any matter of inquiry is final and conclusive . . . but an error made in applying the law to the facts, or an erroneous construction of the law by the Land Department, may be reviewed and corrected by the courts. In *Pierson v.* [*State Board of Land Commissioners*, 14 Idaho 163, 93 P. 775 (1908),] this court said: "If they [the Board] act in a matter without jurisdiction, there is a remedy; if they misapply the law to the fact found, or in case of fraud, there is a remedy.
>
> It is obvious that if the contemplated action of the Board of Land Commissioners involves the exercise of a judgment or discretion vested in them by law, then this court cannot and will not attempt to control that discretion, or in any manner interfere with or direct the action of the board. *If, on the other hand, the action proposed is without authority of law,* or has no legal sanction or authority, or is an attempt to act, not upon the discretion and judgment of the board, but upon a substituted judgment or discretion, or upon the judgment,

14

discretion, and direction of some other board or body, *then and in such cases this court may interrupt them and declare the law on the subject, and point out to them the legal scope within which their judgment and discretion must be exercised*.

*Id*. at 575, 107 P. at 495 (emphases added) (second alteration in the original). In *Balderston*, the legislature, at the urging of the governor, passed a joint resolution directing the Board to relinquish title to certain state lands to private citizens. *Id*. at 577, 107 P. at 495–96. This Court issued the requested writ of prohibition, finding that the joint resolution was not a law of the state and therefore could not be relied upon by the Board as authority. *Id*. at 579–80, 107 P. at 496.

One year after *Balderston*, this Court was again asked to issue a writ of prohibition against the Board in *Pike v. State Board of Land Commissioners*. 19 Idaho 268, 113 P. 447 (1911). In *Pike*, the Board proposed to sell almost 24,000 acres of state lands to the Potlach Lumber Company, the highest bidder at public auction, at the appraised value for that land. *Id*. at 272–75, 113 P. at 450. The appellant offered many reasons why this Court should issue a writ of prohibition preventing the proposed sale, including his belief that auctioning off land that is currently subject to a long-term lease (Potlach Lumber Company had a 20-year lease to remove the timber from the property, 11 years of which remained at the time of the proposed sale) can never bring the State the "maximum possible amount" [9] for lands sold. *Id*. at 287, 113 P. at 453-54. The *Pike* Court declined to issue a writ of prohibition, finding that "[i]t is self-evident . . . that the lands can be sold at public auction for the 'maximum possible amount' which such lands will bring at that time and under conditions then existing." *Id*. at 287, 113 P. at 454. This Court noted that it is a doubtful or questionable business policy to offer lands for public auction under such circumstances, but that the decision to do so was "purely a matter of policy to be determined by the State Board of Land Commissioners, and if they act unwisely they must account to the electors of the state, but their judgment and discretion in such matters cannot be controlled by the courts." *Id*. The Court also noted that:

the Constitution vests the control, management and disposition of state lands in the State Board of Land Commissioners. Section [VIII], art. 9. They are, as it were, the trustees or business managers for the state in handling these lands, and on matters of policy, expediency and the business interest of the state, they are the

_____

[9] At the time when *Pike* was issued Article IX, section 8 of the Idaho Constitution required the Board to manage the endowment lands in a manner that brought the "maximum possible amount therefor". In 1982 this provision was amended to the current version, which requires the Board to "secure the maximum long-term financial return". S.L. 1982, p. 935.

sole and exclusive judges *so long as they do not run counter to the provisions of the Constitution or statute*.

*Id.* at 286, 113 P. at 453 (emphasis added).

In *Idaho Watersheds Project, Inc. v. State Board of Land Commissioners*, a conflict auction took place for one of the state endowment lands, pursuant to I.C. § 58-310, as the then-current lessee and the Idaho Watersheds Project (IWP) both applied to lease the land. 128 Idaho 761, 918 P.2d 1206 (1996). At the conflict auction IWP placed the only bid; the Board nevertheless awarded the lease to the then-current lessee. *Id.* IWP appealed to this Court, arguing that the Board exceeded its authority in granting the lease to a non-bidding party after the conflict auction had been held. *Id.* This Court noted that although the Board had general discretion to choose the bid that, in its judgment would "secure the maximum long term financial return", it could not award the lease to a party that had failed to participate in the I.C. § 58-310 auction at all. *Id.* at 766, 918 P.2d at 1211. This Court reemphasized that "the constitution and laws of the state should at all times be followed and upheld and sustained by the courts, and should not be ignored by public officers in the administration of public affairs of the state." *Id.* (quoting *Tobey v. Bridgewood*, 22 Idaho 566, 584, 127 P. 178, 184-85 (1912), *overruled on other grounds by Idaho-Iowa Lateral & Reservoir Co. v. Fisher*, 27 Idaho 695, 151 P. 998 (1915)).

In *Henry v. Ysursa*, this Court noted that:

> [t]he word "jurisdiction" when used in reference to a writ of prohibition includes powers or authority conferred by law. *Crooks v. Maynard*, 112 Idaho 312, 319, 732 P.2d 281, 288 (1987) (where administrative orders were within the "power and authority" of the administrative district judge, a writ of prohibition would not issue); *Stein v. Morrison*, 9 Idaho 426, 455, 75 P. 246, 256 (1904) (quoting from *Maurer v. Mitchell*, 53 Cal. 289, 292 (1878)) ("The word 'jurisdiction,' when used in connection with 'prohibition,' would be at once understood as being employed in the sense of the legal power or authority 'to hear and determine causes.'").

148 Idaho 913, __, 231 P.3d 1010, 1012 (2008). The jurisdictional question at issue in *Henry* was whether the Secretary of State was acting beyond his jurisdictional authority in placing an independent candidate on the ballot where that candidate met the statutory requirements under I.C. § 34-708, and that statute directed that—where those requirements were met—"the [Secretary of State] shall" place the name of that candidate on the ballot. *Id.* Appellants in *Henry* argued that the candidate had acted improperly and unethically and was not actually in compliance with the requirements for being placed on the ballot. *Id.* at __, 231 P.3d at 1011–12.

Emphasizing that the word "shall" has repeatedly been construed by this court as of mandatory rather than discretionary intent, this Court found that the Secretary of State was not acting outside of his jurisdiction in placing that candidate on the ballot. *Id*. at __, 231 P.3d at 1013–14.

It is true that the Board is granted broad discretion in Article IX, section 8, of the Idaho Constitution to manage the endowment properties in a manner it believes will bring the maximum long-term financial benefit to the Beneficiaries of the endowment trust. However, this discretion is not unrestrained. Article IX, section 8 of the Idaho Constitution directs that the Board must not only manage the public lands in such a manner as will secure the maximum long term financial return, but also "under such regulations as may be prescribed by law." As such, where the Board attempts to manage the endowment property in a manner that violates statutory law it is acting in excess of the discretion it is granted under the Idaho Constitution.

Idaho Code § 58-310A(3) specifically states that "[i]n the absence of the conflict application and auction procedure in the single family, recreational cottage site and homesite lease, and lease renewal process, the board shall insure that each leased lot generates market rent throughout the duration of the lease."[10] The situation before us in the present action is analogous to that presented in *Balderston v. Brady*, where this Court found that the Board was acting in a manner outside of its jurisdictional authority. 17 Idaho 567, 107 P. 493 (1910). Here, I.C. § 58-310A directs the Board not to hold conflict auctions for the cottage sites, but rather to lease these properties at market rent. As was noted in *Idaho Watersheds Project,* "the constitution and laws of the state should at all times be followed and upheld and sustained by the courts, and should not be ignored by public officers in the administration of public affairs of the state." 128 Idaho at 766, 918 P.2d at 1211 (*quoting Tobey*, 22 Idaho at 584, 127 P. at 184–85). Where the Board fails to ensure that the cottage sites generate market rent throughout the duration of the leases it cannot be said that Board has acted within its jurisdictional authority.

As noted above, where significant leasehold value accrues for the cottage sites those cottage sites are not being leased at market rent. *See* IDAPA 20.03.13.10.06. By including a premium rent provision in the cottage leases the Board is implicitly recognizing that it will not be achieving market rent. Beyond mere implicit recognition, however, the evidence offers explicit

---

[10] Although not argued by any party here, I.C. § 58-310A is clearly unconstitutional as—in eliminating the conflict auction procedure and instead requiring "market rent"—the legislature encroached upon the discretion constitutionally granted to the Land Board. Incidentally, it seems axiomatic that where the Land Board failed to obtain market rent, it was not obtaining the maximum long-term financial returns, as is mandated by the Idaho Constitution. However, until declared unconstitutional, I.C. § 58-310A must still be followed by the Land Board.

recognition of this concept by a majority of the Board. When discussing the Cottage Site Subcommittee's proposal to the Board, on March 16, 2010, one Board member said, "Do we acknowledge that we're not at market rent by using the term premium rent? Yes. We've done that since 1981." Another member remarked, "I do disagree with your rental rate recommendation. Just – I don't think that will bring us to a true market rent, as you said. And by continuing to collect the premium rent, we're openly acknowledging that our rental rate is too low." Attorney General Wasden has likewise made it clear than he believes the existence of premium rent demonstrates that the new cottage leases would not achieve market rent. Thus, three out of the five members of the Board have expressly stated that the existence of premium rent shows that the Board is failing to achieve market rent throughout the duration of the leases.

The five-year phase-in period that the Board proposes to implement with the new cottage leases also fails to comply with the Board's statutory duty. Assuming the Board has determined, in its discretion, that market rent for the cottage sites is a return of 4% of the average value of the cottage sites over the previous 10 years, there is then no justification for failing to ensure that the cottage sites generate this market rent during the five-year phase-in. As noted above, I.C. § 58-310A requires the Board to generate market rent "throughout the duration of the lease", not merely at certain points during the lease. This reasoning also applies to the five-year phase-in proposed for the increase of premium rent from 10% to 50%. Even disregarding the fact that the existence of premium rent is evidence that market rent is not being received, the phase-in period would still violate I.C. § 58-310A.

As it is clear from the record before this Court that the Land Board has acted in excess of its jurisdiction, and as there is no other plain, speedy and adequate remedy available at law I respectfully dissent.

Justice W. JONES CONCURS.